ALTIMARI, Circuit Judge:
 

 This appeal involves the showing a debt- or-employer must make in order to obtain Bankruptcy Court approval of the employer’s application to reject a collective bargaining agreement in accordance with 11 U.S.C. § 1113. We agree with the conclusions and, for the most part, the analysis of the Bankruptcy Court for the Southern District of New York (Burton R. Lifland, J.). Therefore, we affirm the decision of the United States District Court for the Southern District of New York (Richard Owen, J.) upholding Judge Lifland’s approval of Carey Transportation’s application to reject two collective bargaining agreements with Truck Drivers Local 807 (“Local 807” or “the union”).
 

 
 *85
 

 FACTS AND PROCEEDINGS BELOW
 

 Carey, a wholly owned subsidiary of Schiavone Carrier Corporation, commenced this litigation by filing a voluntary reorganization petition under Chapter 11 of the Bankruptcy Code in April 1985. Carey, both prior to and since that filing, has been engaged in the business of providing commuter bus service between New York City and Kennedy and LaGuardia Airports.
 

 Local 807 has been the exclusive bargaining representative of Carey’s bus drivers and station employees. Local 807 and Carey entered into collective bargaining agreements covering these two groups of employees on August 20, 1982, thereby settling a sixty-four day strike by union members. These two agreements were scheduled to expire on February 28, 1986.
 

 Carey officials have blamed the strike for a subsequent 30% drop in ridership and the yearly revenue losses that preceded its filing for reorganization. Carey has operated at a loss since at least December 31, 1981, reporting annual losses of $750,000 for fiscal year 1983, $1,500,000 for fiscal year 1984, and $2,500,000 for fiscal year 1985. Jt.App. 226.
 

 In September 1983, Carey terminated fifty Local 807 members employed as station workers, although an arbitrator later directed that ten of them be rehired with backpay. The net result of these forty layoffs, according to Carey officials, has been an annual cost savings of approximately $1 million. Jt.App. 174.
 

 In 1984 and 1985, Carey sought and obtained concessions from a union representing Carey's mechanics and repair-shop workers. Those concessions led to layoffs of approximately eight workers and annual cost savings estimated at $144,000. Jt. App. 372-74.
 

 In June 1984, Carey proposed several modifications in its agreements with Local 807. After negotiations, Local 807 and Carey agreed on certain supplemental provisions applicable only to drivers hired after July 1, 1984. These “second-tier” drivers would not get any paid sick days, and they would receive significantly reduced wages, overtime pay, and benefits. These changes, according to Carey, yielded savings of only $100,000 prior to Carey’s filing for bankruptcy. The reason given for the relatively small savings was that seasonal variations in industry business resulted in few drivers being hired after the effective date of the Supplement. Jt.App. 380-81.
 

 On January 31, 1985, counsel for Carey wrote to Local 807 representatives, requesting additional modifications of the two agreements. A series of meetings took place during February and March of 1985, with Carey warning that a failure to reach agreement could force the company to file a Chapter 11 petition and, most likely, apply for permission to reject the existing agreements. Jt.App. 544-46. Near the end of these sessions, union negotiators agreed to present to union members a set of modifications affecting lunch periods, booking and check-out time, driver rotation rules, holidays, vacation days, sick days, fringe benefit contributions, supplemental unemployment compensation, and supplemental disability insurance. Jt.App. 169, 556-61, 564-69. Those concessions, if approved and implemented, would have yielded approximately $750,000 in yearly savings. Jt.App. 557.
 

 On March 27th, however, management added to this proposed modification several additional terms, and described the resultant package as its final offer. In essence, this last set of modifications would have extended the expiration date of the contract for an additional two years, with wages and fringe benefits frozen at the proposed levels until April 1,1987. At that time, a “reopener” provision would permit the union to bargain for increased wages and benefits during the final year of the extended contract. The union requested that there be binding arbitration if reopen-er negotiations proved unsuccessful, but management rejected this demand. Jt. App. 557-58.
 

 This final offer was submitted to the bargaining unit employees on March 29, 1985 and rejected by an 82-7 vote. According to Local 807’s business agent, the union members were particularly adamant about
 
 *86
 
 not accepting the two-year contract extension and the freeze on wages and benefits. Jt.App. 710-11.
 

 Carey filed its Chapter 11 petition with the Bankruptcy Court on April 4, 1985, and one day later, delivered to Local 807 a proposal to modify its collective bargaining agreements pursuant to 11 U.S.C. § 1113(b)(1)(A). This post-petition proposal was designed to achieve annual savings of $1.8 million for each of the next three fiscal years. Jt.App. 117.
 

 Carey planned to achieve savings of this magnitude by (1) freezing all wages for second-tier drivers and reducing wages for first-tier drivers (those on the payroll prior to July 1, 1984) by $1.00 per hour; (2) reducing health and pension benefit contributions by approximately $1.50 per hour; (3) replacing daily overtime with weekly overtime; (4) eliminating all sick days and reducing the number of paid holidays; (5) eliminating supplemental workers’ compensation and supplemental disability payments; (6) eliminating premium payments and reducing commissions paid to charter drivers; and (7) changing numerous scheduling and assignment rules. All terms were to be frozen for three years under this post-petition proposal.
 

 When Carey presented this proposal to Local 807, company officers were projecting fiscal year 1986 losses of approximately $950,000. (Carey revised this estimate shortly thereafter, projecting losses of $746,000. Jt.App. 39.) In a cover letter accompanying this proposal, Carey asserted that it needed to slash costs by considerably more than its projected losses in order to improve its long-term financial health by updating and expanding its bus fleet, operations, and maintenance facilities. Without savings of this magnitude, Carey explained, it would be unable to propose a feasible reorganization plan to creditors and resolve its indebtedness to them. Carey requested a meeting with Local 807 representatives “to discuss the proposals and to attempt to reach mutually satisfactory modifications of the agreement[s].” Jt.App. 118.
 

 Shortly after the Company submitted its post-petition proposal, dissension within Local 807 became obvious; in fact, virtually all union members formed a “Drivers Committee” and hired an attorney to represent them separately from Local 807 officials. The Drivers Committee then refused to participate in most post-petition negotiations, despite union officials’ pleas that they reconsider that decision to “stonewall” these sessions. Jt.App. 138-39, 702-03.
 

 In the meantime, Carey filed its section 1113 application to reject its bargaining agreements. The Bankruptcy Court scheduled and conducted five days of hearings on Carey’s application, urging the parties to continue negotiations at the same time. After the third day of hearings, a Local 807 officer presented to Carey a counter-proposal designed to achieve annual cost savings of $776,000. The counter-proposal would have extended the expiration date of the existing agreements by fifteen months, and frozen wages and benefits except for a reopener, with binding arbitration, scheduled for June 24, 1986. Jt.App. 191-93, 671-87. Carey found the counter-proposal unacceptable, and the hearings continued.
 

 The central issues at the hearing, as on this appeal, were whether the post-petition proposal contained only necessary modifications of the existing agreements,
 
 see
 
 11 U.S.C. § 1113(b)(1)(A), whether that proposal treated all parties fairly and equitably,
 
 see id.,
 
 whether Local 807 lacked good cause for rejecting that proposal,
 
 see
 
 § 1113(c)(2), and whether the balancing of the equities clearly favored rejection of the bargaining agreements, see § 1113(c)(3).
 

 On June 14, 1985, the bankruptcy court issued its decision approving Carey’s application to reject the collective bargaining agreements. Bankruptcy Judge Lifland adopted, with certain modifications, a nine-step analysis of § 1113 first used in
 
 In re American Provision Co.,
 
 44 B.R. 907 (Bankr.D.Minn.1984). Applying this analysis, he held that Carey had met its burden of proving compliance with the procedural and substantive standards set forth in the
 
 *87
 
 statute.
 
 See In re Carey Transportation, Inc.,
 
 50 B.R. 203 (Bankr.S.D.N.Y.1985).
 

 On appeal, the United States District Court for the Southern District of New York affirmed on the opinion below, in an Order dated August 14, 1986. The Union filed a timely notice of appeal on September 12, 1986.
 

 DISCUSSION
 

 Congress enacted section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113,
 
 [1]
 
 in response to
 
 NLRB v. Bildisco & Bildisco,
 
 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), where the Court concluded that a debtor-in-possession could reject a collective bargaining agreement, subject to certain constraints.
 

 Bildisco
 
 involved two key holdings. The first involved the proper substantive standard to be used by bankruptcy courts asked to approve rejections of collective bargaining agreements, while the second involved the procedural prerequisites to rejection. In defining the substantive standard, the Supreme Court declined to adopt this court’s previous rule that rejection could be approved only after a finding that adherence to the agreement would “thwart efforts to save a failing [company] in bankruptcy from collapse.”
 
 Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.,
 
 523 F.2d 164, 167-69 (2d Cir.),
 
 cert. denied,
 
 423 U.S. 1017, 96 S.Ct. 855, 47 L.Ed.2d 82 (1975). The Court instead endorsed the equitable standard set forth in
 
 In re Brada Miller Freight System, Inc.,
 
 702 F.2d 890 (11th Cir.1983), and held that the debtor need only prove “that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract.” 465 U.S. at 526, 104 S.Ct. at 1196.
 

 On the procedural question, the
 
 Bildisco
 
 Court held that a reorganizing debtor did not have to engage in collective bargaining before modifying or rejecting provisions of the agreement, and that such unilateral alterations by a debtor would not violate either section 8(a)(5) or section 8(d) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), (d).
 
 See
 
 465 U.S. at 534, 104 S.Ct. at 1200. This procedural ruling intensified existing congressional concerns over reports that some companies were misusing the bankruptcy law in collective bargaining.
 
 See Wheeling-Pittsburgh Steel Corp. v. United Steelworkers,
 
 791 F.2d 1074, 1082 (3d Cir.1986) (citing Rosenberg,
 
 Bankruptcy and the Collective Bargaining Agreement
 
 — A
 
 Brief Lesson in the Use of the Constitutional System of Checks and Balances,
 
 58 Am.Bankr.L.J. 293, 312 (1984)). Congressional response to
 
 Bildisco
 
 was swift, culminating within a few short months in the passage of section 1113.
 
 In re Century Brass Products, Inc.,
 
 795 F.2d 265, 266-67, 271-73 (2d Cir.) (discussing legislative history),
 
 cert, denied,
 
 — U.S.-, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986);
 
 Wheeling-Pittsburgh Steel,
 
 791 F.2d at 1081-83.
 

 Before addressing the question of whether Carey has proven its compliance with the requirements of the new statute, we must consider a preliminary issue raised by appellants.
 

 
 *88
 

 I. Standard of Appellate Review
 

 Local 807 argues that the bankruptcy-court’s findings of procedural and substantive compliance with Section 1113 involve mixed questions of law and fact. Therefore, appellant insists, those findings are subject to
 
 de novo
 
 review by the district and circuit courts. We disagree.
 

 The bankruptcy court’s interpretation of the statute, specifically its reading of what the debtor must prove before the court may approve rejection, does constitute a conclusion of law subject to plenary review.
 
 See In re Tesmetges,
 
 47 B.R. 385, 388 (E.D.N.Y.1984) (Bankr.R. 8013 requires reviewing courts to make independent determination of applicable law when reviewing bankruptcy court’s legal conclusions). If the bankruptcy court correctly interprets the statute, however, its conclusions as to whether the debtor has or has not proven compliance with the statute will generally be factual findings which can be reversed only if clearly erroneous. Bankr.R. 8013; Fed.R.Civ.P. 52(a);
 
 see In re Rath Packing Co.,
 
 48 B.R. 315, 316 (N.D.Iowa 1985);
 
 cf. Tesmetges,
 
 47 B.R. at 388. This is true regardless of whether the bankruptcy court’s findings rest on the testimony of witnesses at a hearing held pursuant to § 1113(d)(1), or on documentary evidence submitted in connection with the application.
 
 See Anderson v. City of Bessemer City,
 
 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985).
 

 II. Merits of the Decision Below
 

 In
 
 Century Brass,
 
 795 F.2d at 272, this court observed that Congress undeniably overturned the procedural prong of
 
 Bildis-co
 
 when it enacted section 1113. Although
 
 Century Brass
 
 turned on the debtor’s failure to satisfy these new procedural requirements, the court briefly outlined the substantive showings a debtor must make before its application to reject a collective bargaining agreement may receive judicial approval. These substantive standards are at issue on this appeal.
 

 Briefly stated, the statute permits the bankruptcy court to approve a rejection application only if the debtor, besides following the procedures set forth by Congress, makes three substantive showings. The first is that its post-petition proposal for modifications satisfies § 1113(b)(1), which in turn limits the debtor to proposing only “those necessary modifications in ... benefits and protections that are necessary to permit the reorganization of the debtor,” and obliges the debtor to assure the court that “all creditors, the debtor and all affected parties are treated fairly and equitably.” Second, the debtor must show that the union has rejected this proposal without good cause. Bankr.Code § 1113(c)(2). Third, the debtor must prove that “the balance of the equities clearly favors rejection of [the bargaining] agreement.” Code § 1113(c)(3). The first two statutory requirements go beyond the substantive test adopted by the
 
 Bildisco
 
 Court, but the third requirement represents a codification of the equitable test adopted in
 
 Bildisco. See Century Brass,
 
 795 F.2d at 273; Gibson,
 
 The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S. C. § 1113,
 
 58 Am.Bankr.L.J. 325, 335, 343 (1984).
 

 We reaffirm and, where necessary, explicate the
 
 Century Brass
 
 panel’s discussion of section 1113’s substantive requirements. We affirm the decision below because it substantially comports with our reading of the statute, and because Judge Lifland’s factual findings are not clearly erroneous.
 

 1.
 
 Compliance with § 1113(b)(1)
 

 (a) Necessity of the modifications
 

 As the
 
 Century Brass
 
 panel noted, this provision “emphasizes the requirement of the debtor’s good faith in seeking to modify its existing labor contract.” 795 F.2d at 273 (citing 130 Cong.Rec. S. 8898 (daily ed. June 29, 1984) (statement of Senator Packwood)). Although all courts appear to agree on that basic principle, a judicial controversy has arisen over two additional, related questions raised by this provision: (1) how necessary must the proposed modifications be, and (2) to what goal must those alterations be necessary?
 
 See Wheeling-Pittsburgh Steel,
 
 791 F.2d at
 
 *89
 
 1088;
 
 In re Royal Composing Room, Inc.,
 
 62 B.R. 403, 417-18 (Bankr.S.D.N.Y.1986).
 

 In answer to the first of these questions, the Third Circuit concluded that “necessary” as used in subsection (b)(1)(A) is synonymous with “essential” in subsection (e), which authorizes the court to approve certain non-negotiated interim changes while the rejection application is pending. Thus, the court held, necessity must “be construed strictly to signify only modifications that the trustee is constrained to accept.”
 
 Wheeling-Pittsburgh Steel,
 
 791 F.2d at 1088. As to the second question, the Third Circuit concluded that the statute requires the bankruptcy court to focus its attention on “the somewhat shorter term goal of preventing ... liquidation ... rather than the longer term issue of the debtor’s ultimate future.”
 
 Id.
 
 at 1089.
 

 Local 807 asks us to adopt the Third Circuit’s reasoning, arguing that the post-petition proposal must fail because it sought more than break-even cost reductions, because the proposed three year term was too long in relation to the eight months remaining under the existing agreement, and because it did not provide for wages and benefits to “snap-back” in the event that Carey’s financial performance improved.
 
 See Wheeling-Pittsburgh Steel,
 
 791 F.2d at 1089-90. We decline to do so.
 

 First of all, the legislative history strongly suggests that “necessary” should not be equated with “essential” or bare minimum. Although the Third Circuit may be correct that the “necessary” language was viewed as a victory for organized labor because it approximated the “minimum modifications” language urged by Senator Packwood,
 
 see id.
 
 at 1088, Congress obviously did not adopt Senator Packwood’s proposal. Instead, as the
 
 Wheeling-Pittsburgh Steel
 
 panel acknowledged, Congress settled on “a substitute for this clause.”
 
 Id.
 
 at 1087. Congress’ ultimate choice of this substitute clause suggests that it was uncomfortable with language suggesting that a debtor must prove that its initial post-petition proposal contained only bare-minimum changes.
 

 Judge Lifland, in the decision below, properly pointed out a second reason for not reading “necessary” as the equivalent of “essential” or bare minimum. Because the statute requires the debtor to negotiate in good faith over the proposed modifications, an employer who initially proposed truly minimal changes would have no room for good faith negotiating, while one who agreed to any substantive changes would be unable to prove that its initial proposals were minimal.
 
 See
 
 50 B.R. at 209 (quoting
 
 In re Allied Delivery System Co.,
 
 49 B.R. 700, 702 (Bankr.N.D.Ohio 1985)). Thus, requiring the debtor to propose bare-minimum modifications at the outset would make it virtually impossible for the debtor to meet its other statutory obligations.
 

 The Third Circuit’s answer to the “necessary to what” question is also troubling. In our view, the
 
 Wheeling-Pittsburgh
 
 court did not adequately consider the significant differences between interim relief requests and post-petition modification proposals. Interim relief is available only until the hearing process is completed — normally within two months,
 
 see
 
 § 1113(d)(1), (2) — and only upon a showing that adherence to the agreement during that time could imperil “continuation of the debtor’s business” or cause “irreparable damage to the estate.”
 
 Id.
 
 § 1113(e). In the interim relief context, therefore, it is only proper that the court focus on the bare minimum requirements for short-term survival.
 
 Royal Composing Room,
 
 62 B.R. at 417-18. In making the decision whether to permit the debtor to reject its bargaining agreement, however, the court must consider whether rejection would increase the likelihood of successful reorganization. A final reorganization plan, in turn, can be confirmed only if the court determines that neither liquidation nor a need for further reorganization is likely to follow.
 
 Id.
 
 at 417 (quoting Bankr.Code § 1129(a)(ll)). Thus, in virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor’s ultimate future and estimating what the debtor needs to attain financial health. As the
 
 Royal Composing Room
 
 court phrased it, “A debtor can live on water alone for a
 
 *90
 
 short time but over the long haul it needs food to sustain itself and retain its vigor.”
 
 Id.
 
 at 418.
 

 Moreover, the length of Carey’s proposal and the absence of a snap-back provision likewise did not require rejection of the proposal. While the Third Circuit relied on a similar argument in finding a proposed modification not “necessary” for purposes of section 1118,
 
 Wheeling-Pittsburgh,
 
 791 F.2d at 1090-91, this argument was not raised in either court below and may not be raised here for the first time.
 
 Schmidt v. Polish People’s Republic,
 
 742 F.2d 67, 70 (2d Cir.1984). The only exception to this rule, avoidance of manifest injustice,
 
 id.,
 
 is inapplicable here because Local 807 wholly failed to demonstrate that Carey’s proposed three year term was unnecessary or exceeded either the prevailing industry practice or the parties’ past experience.
 
 Cf. Wheeling-Pittsburgh,
 
 791 F.2d at 1089-91.
 

 In sum, we conclude that the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully. Although Judge Lifland did not incorporate each of these factors into his discussion of necessity,
 
 see
 
 50 B.R. at 209, he did reach each of these questions in the course of his decision.
 
 See id.
 
 (finding modifications necessary to rehabilitate Carey and to provide for successful reorganization);
 
 id.
 
 at 212-13 (finding that Carey sought relief in good faith, despite union assertions to the contrary). Thus we cannot conclude that the lower court either misread or misapplied the “necessary modifications” requirement as a matter of law.
 

 Each of the findings pertinent to this inquiry, moreover, is supported by substantial evidence in the record. For instance, record evidence indicates that Carey was losing large sums of money, that its Local 807 labor costs (in contrast to other employees’ salaries and benefits) were well above industry averages, and that Carey lacked sufficient assets to meet its current expenses. This well-documented testimony from Carey officials supports the court’s finding that Carey had good faith reasons for seeking modifications in its Local 807 agreements. Moreover, record evidence also supports the view that Carey needed to upgrade its facilities and its vehicles in order to complete reorganization successfully. Therefore the bankruptcy court’s conclusion that Carey needed to obtain modifications of the magnitude requested, and not merely break-even cost reductions as Local 807 argues, is not clearly erroneous.
 

 (b) Fairness as to all parties
 

 The requirement that the debtor assure the court that “all creditors, the debtor and all affected parties are treated fairly and equitably,” Code § 1113(b)(1)(A), is a relatively straightforward one. The purpose of this provision, according to
 
 Century Brass,
 
 795 F.2d at 273, “is to spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree.” Local 807 argues that the bankruptcy court erred as a matter of both law and fact in assessing the burdens imposed on management, non-union employees, the parent company, and Carey’s creditors. We disagree.
 

 The debtor is not required to prove, in all instances, that managers and non-union employees will have their salaries and benefits cut to the same degree that union workers’ benefits are to be reduced. To be sure, such a showing would assure the court that these affected parties are being asked to shoulder a proportionate share of the burden, but we decline to hold that this showing must be made in every case.
 

 Rather, a debtor can rely on proof that managers and non-union employees are assuming increased responsibilities as a result of staff reductions without receiving commensurate salary increases; this is surely a sacrifice for these individuals. Particularly where, as here, the court finds that only the employees covered by the pertinent bargaining agreements are receiving pay and benefits above industry
 
 *91
 
 standards, it is not unfair or inequitable to exempt the other employees from pay and benefit reductions.
 

 Local 807 has consistently argued that Carey’s managers and supervisors are more than adequately compensated, that Local 807 members are not paid substantially more than their counterparts working for Carey’s competitors, and that non-union staffing levels have increased rather than decreased since Schiavone purchased Carey. But substantial record evidence supports each of the bankruptcy court’s contrary conclusions. For instance, the record contains unrebutted testimony that Carey drivers' hourly wages and benefits exceeded those paid by other private carriers by several dollars per hour, Jt.App. 418-20 (discussing comparison chart in Debtor’s Exhibit A), while managers’ and supervisors’ compensation packages were described as “barely competitive.”
 
 Id.
 
 at 489-92. Carey also, offered evidence of pre-petition reductions in its managerial staff (from twenty-four to fifteen people) and its non-union supervisory staff (from fifteen to twelve), achieved by increasing the remaining officials' responsibilities.
 
 Id.
 
 at 474-78. In light of this record evidence, we cannot disturb the bankruptcy court's findings on this score.
 

 The lower court also correctly looked to pre-petition concessions obtained from the mechanics’ union and two of Carey’s principal creditors — the MTA and the Port Authority — as proof that these parties were contributing fairly and equitably to the effort to keep Carey afloat. Because a section 1113 application will almost always be filed before an overall reorganization plan can be prepared, the debtor cannot be expected to identify future alterations in its debt structure.
 
 See In re Kentucky Truck Sales,
 
 52 B.R. 797, 802 (Bankr.W.D.Ky. 1985). Local 807 argues that the lower court overlooked Schiavone’s status as a substantial creditor of its subsidiary and Carey’s failure to show that Schiavone would write off part of this debt. We reject the suggestion that the statutory requirement that “all creditors” be treated fairly and equitably,
 
 see
 
 § 1113(b)(1)(A), means that a creditor who is also an owner of the debtor must ordinarily take a smaller percentage dividend than other creditors on its bona fide claims. The mere fact that there have been intercompany transactions between a debtor and its owner is not a source of unfairness to other creditors unless the transactions themselves were financially unfair to the debtor.
 
 See In re Kentucky Truck Sales, 52
 
 B.R. at 803-04. Local 807 has not called to our attention, nor has our own review of the record disclosed, any evidence to indicate that Schia-vone’s claims against Carey arise from transactions that were financially unfair to Carey. And were there an indication of such unfair dealing, it would not necessarily support the Union’s argument that Carey’s rejection of its labor contracts should be disapproved. The more appropriate response would seem to be to seek the equitable subordination of claims by the owner,
 
 see
 
 11 U.S.C. § 510(c), or the appointment of a trustee who could seek recovery of any fraudulent conveyance,
 
 see
 
 11 U.S.C. §§ 544, 548, 1104(a); these remedies would more fairly and equitably benefit all interested parties, not just the union members.
 

 Finally, we note that even if a greater sacrifice is required of an owner-creditor than of other creditors, a write-off of outstanding debts is not the only way a creditor can assist its debtor. Here the record shows that Schiavone did not charge any interest on its loans to Carey, Jt.App. 243-44, and that Schiavone otherwise subsidized Carey’s day-to-day operations. By doing so, Schiavone made sacrifices that contributed significantly to Carey’s survival.
 

 In light of this evidence, we affirm the bankruptcy court’s ruling that all parties were participating “fairly and equitably” in the attempt to save Carey from liquidation.
 

 2.
 
 Good Cause
 

 The debtor’s obligation to prove that the union lacked good cause for refusing the post-petition proposal, like the necessity question, has been the subject of some debate among commentators and the
 
 *92
 
 courts. The bankruptcy court here reasoned that because the proposed modifications were necessary, fair, and equitable, the union’s refusal to accept them was without good cause. 50 B.R. at 211-12 (citing
 
 In re Allied Delivery System Co.,
 
 49 B.R. 700 (Bankr.N.D. Ohio 1985);
 
 In re Salt Creek Freightways,
 
 47 B.R. 835 (Bankr.D.Wy.1985)). This reasoning, of course, suggests that the good cause provision adds nothing to the other substantive requirements of the statute.
 
 See
 
 Gibson,
 
 supra, The New Law on Rejection,
 
 58 Am. Bankr.L.J. at 340-41.
 

 We conclude, nonetheless, that this analysis is proper where, as here, the union has neither participated meaningfully in post-petition negotiations nor offered any reason for rejecting the proposal other than its view that the proposed modifications were excessive. At least one commentator has noted that the statute appears to authorize conduct similar to what the Drivers Committee did here: “stonewalling” post-petition negotiations and hoping that the courts will find that the proposal does not comply with subsection (b)(1).
 
 See id.
 
 at 341,
 
 discussed in Royal Composing Room,
 
 62 B.R. at 407 & n. 5. This tactic is unacceptable and inconsistent with Congressional intent, as the
 
 Royal Composing Room
 
 opinion makes clear. This good cause requirement was “ ‘intended to ensure that a continuing process of good faith negotiations will take place before court involvement.’ ” 62 B.R. at 406 (quoting remarks by Representative Morrison).
 

 Thus, even though the debtor retains the ultimate burden of persuading the court that the union lacked good cause for refusing proposed modifications, the union must come forward with evidence of “its reason for declining to accept the debtor’s proposal in whole or in part. If prehear-ing, a union has assigned no reason for its refusal to accept a debtor’s proposal, it has perforce refused to accept the proposal without good cause under Code § 1113(e)(2).”
 
 Id.
 
 at 407. We agree with the bankruptcy court that because the union engaged in such prehearing stonewalling here, it now cannot claim that it had good cause for refusing the proposal.
 

 Local 807 insists that because it later counter-proposed modifications that would have yielded significant cost savings, it had good cause for rejecting the debtor’s proposal. We find, however, that ample record evidence supports the bankruptcy court’s conclusion that this counter-proposal did not have the backing of union members. 50 B.R. at 211. In fact, the counter-proposal was virtually identical to a pre-pe-tition request that the union members had rejected overwhelmingly. A union’s presentation of a counter-offer that its members do not support does not satisfy the good cause requirement. Moreover, we have already upheld the lower court’s finding that greater than break-even cost savings were necessary. Therefore, this is not a situation where a union’s counterproposal of an equally effective set of modifications might justify its refusal to accept management’s proposal.
 
 Cf
 
 Gibson,
 
 supra, The New Law on Rejection,
 
 58 Am.Bankr.L.J. at 341-42 (discussing whether presentation of such a counter-proposal would satisfy the good cause requirement). The union’s manifest failure to participate meaningfully in the post-petition negotiations confirms its lack of justification for rejecting Carey’s proposed modifications.
 

 3.
 
 Balancing the Equities
 

 This requirement, as we noted in
 
 Century Brass,
 
 is a codification of the
 
 Bildisco
 
 standard.
 
 See
 
 795 F.2d at 273; Gibson,
 
 supra, The New Law on Rejection,
 
 58 Am. Bankr.L.J. at 343. Therefore, the factors identified in
 
 Bildisco
 
 and other cases preceding section 1113’s enactment remain applicable today. And although we do not seek to set outer limits on what courts may consider under this broad, flexible test, we note the
 
 Bildisco
 
 Court’s reminder that bankruptcy courts “must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of
 
 *93
 
 465 U.S. at 527, 104 the reorganization: S.Ct. at 1197.
 

 The lower court’s decision, for the most part, is consistent with still-vital case law applying this equitable balancing test. From
 
 Bildisco
 
 and the cases consistent with its analysis, we glean at least six permissible equitable considerations, many of which also factor into the other substantive requirements imposed by section 1113. Those are (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors’ claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees’ wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtor’s financial dilemma.
 
 See, e.g., Bildisco,
 
 465 U.S. at 525-26, 104 S.Ct. at 1195-96,
 
 aff'g
 
 682 F.2d 72, 79-80 (3d Cir.1982);
 
 In re Brada Miller Freight System, Inc.,
 
 702 F.2d 890, 898-900 (11th Cir. 1983);
 
 Shopmen’s Local Union No. 455 v. Kevin Steel Products, Inc.,
 
 519 F.2d 698, 707 (2d Cir.1975);
 
 see also
 
 Gibson,
 
 supra, The New Law on Rejection,
 
 58 Am.Bankr. L.J. at 343-45. The only analytical error we find in the lower court’s balancing of the equities in this case was its insistence that an allegation of bad faith in initiating the chapter 11 proceeding may not be raised in an objection to a section 1113 application.
 
 See
 
 50 B.R. at 212-13. We agree with the
 
 Brada Miller
 
 court, 702 F.2d at 900, that equity would preclude a court from approving rejection if the debt- or were misusing the entire chapter 11 process. But the lower court’s suggestion that this contention would better be raised in a motion to dismiss the entire proceeding or to have a receiver appointed is of no moment. This is because Judge Lifland alternatively found, with ample support in the record, that Carey had a good faith need for seeking protection under chapter 11.
 

 Substantial record evidence supports the lower court’s other findings pertinent to this inquiry, despite the union’s continued insistence that such support is lacking. For instance, documentary evidence in the record is consistent with the district court’s findings that unionized labor costs were approximately 60% above the industry average, that 66% of Carey’s employees are unionized, that managers, supervisors, and non-union workers were receiving less than average compensation while taking on increased workloads, and that Local 807, therefore, could fairly be expected to bear a substantial proportion of the needed cost-cutting measures. Record evidence also clearly shows that increasing losses in previous years, and continued but decreased projected losses in the then-current year, made liquidation a very real threat. The Union has not attempted to refute the evidence indicating that the company’s low asset value, the secured creditors’ existing claims, and the anticipated costs of administration and liquidation, would leave little or nothing for unsecured creditors and shareholders if the liquidation threat materialized. In view of this substantial and largely unrebutted evidence, we concur in the bankruptcy court’s conclusion that the equities clearly favored rejection of the Local 807 agreements.
 

 CONCLUSION
 

 For these reasons, we affirm the judgment of the district court upholding the bankruptcy court’s approval of Carey's section 1113 application to reject its bargaining agreements with Local 807.
 

 [1]
 

 . Section 1113 provides in pertinent part:
 

 (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section 'trustee' shall include a debtor in possession), shall—
 

 (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protection that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably. ...
 

 (c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
 

 (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
 

 (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
 

 (3) the balance of the equities clearly favors rejection of such agreement.
 

 11 U.S.C. § 1113(b), (c).