**In re PIERCE TERMINAL WAREHOUSE, INC.,**
**Debtor.**

**In re PIERCE VAN LINES, INC., d/b/a**
**Pierce Moving & Storage, Debtor.**

Bankruptcy Nos. X89–01774S,
X89–01775S.

United States Bankruptcy Court,
N.D. Iowa, W.D.

April 3, 1991.

Donald H. Molstad, Sioux City, Iowa, for debtors.

## ORDERS RE: MOTIONS OF DEBTORS–IN–POSSESSION TO REJECT COLLECTIVE BARGAINING AGREEMENTS

WILLIAM L. EDMONDS, Bankruptcy Judge.

Debtors-in-possession in these separate bankruptcy cases seek authority to reject collective bargaining agreements. The affected labor union objects. Hearing on the contested matters was held March 5, 1991 in Sioux City, Iowa. Inasmuch as the debtor corporations have common ownership and the labor union representing the bargaining unit is the same in each case, counsel for the parties requested at the outset of hearings that the matters be consolidated for trial. That motion was granted. Because the issues are identical, and because of the existence of a substantial number of common facts, the court will issue its ruling, including findings of fact and conclusions of law, in one document. Based upon the evidence and arguments, the court agrees with the union that debtors-in-possession should not be permitted to reject the collective bargaining agreements.

### I.

#### FINDINGS OF FACT

Pierce Van Lines, Inc. (VAN LINES) is an agent for Allied Van Lines and is in the business of moving and storing household goods and office equipment. Pierce Terminal Warehouse, Inc. (TERMINAL) operates a warehouse in Sioux City. Manufacturers use Terminal as a storage location and

distribution point for their inventories of goods. Generally, customers of the manufacturers come to the warehouse to pick up purchased goods, but Terminal also provides some delivery services. Dean Pierce (PIERCE) is the president and sole shareholder of each corporation.

Van Lines has six employees: Pierce, four office workers, and one truck driver. Terminal has one employee, who is a warehouse worker. Van Lines and Terminal have entered into separate collective bargaining agreements with General Drivers and Helpers Union Local No. 554 of Sioux City, Iowa, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (UNION). The union has represented Van Lines' employees since the mid to late 1950s. The most recent collective bargaining contracts for each of the debtors was executed in 1989. Each contract is effective for the period March 31, 1989 to March 31, 1992. The labor agreements for the two companies are separate, but the terms are identical. The single employee of Terminal is the member of the bargaining unit covered by the Terminal's agreement with the union. The driver for Van Lines is the only employee covered by Van Lines' agreement with the union. Pursuant to the Van Lines/union agreement, the covered driver has received or will receive these wages: $8.25 per hour effective April 1, 1989, $8.50 per hour effective April 1, 1990, and $8.75 per hour effective April 1, 1991. (Exhibit 7, section 8 of Appendix "A"). Pierce testified that the warehouse employee receives the same scale. His wages, however, are paid by Van Lines.

Section 18 of the contracts sets forth the employers' obligations to contribute to the Central States Southeast and Southwest Areas Health & Welfare Fund on behalf of each employee for the purpose of providing life, health and welfare insurance. The contracts provide for a contribution of $58.00 per week per covered employee beginning March 31, 1989; $66.00 per week per covered employee beginning March 31, 1990; and $74.00 per week per covered employee beginning March 31, 1991. Central States administers the health and wel-

fare fund. (Exhibit 7, Article 18, Section 1).

Article 19 of the contracts requires the employers to contribute to a Pension Fund on behalf of covered employees. Section 1 of the Article specifies a contribution of $61.00 per week for each covered employee during the three years of the contract. (Exhibit 7, Article 19, section 1). The fund is administered by Southeast and Southwest Areas Pension Fund.

As a result of these contract obligations, Terminal and Van Lines must annually contribute $3,172.00 to the pension fund per bargaining unit employee. Health and welfare contributions for *each* employee total $3,432.00 for the 1990–91 contract year and $3,848.00 annually per employee for the 1991–92 contract year.

On a calendar year basis, the health and welfare contributions for each company would be $3,175.00 in 1991 and $3,848.00 in 1992. For 1991, this is calculated by multiplying three months times 4.3 weeks per month times $66.00 and adding the result to the result of 4.3 weeks per month times nine months times $74.00. For 1992, it is calculated by multiplying $74.00 times 52 weeks.

Sometime prior to the filing of the bankruptcy cases, the Central States funds filed a civil action against the corporations in Illinois. It sought contributions to the funds in behalf of non-union employees. The Central States funds demanded damages between $100,000.00 and $150,000.00. The suit was the result of a Central States' audit of the corporations for the period December 30, 1979 through December 28, 1985. Although the corporations were advised by legal counsel that they well might prevail against Central States' claims, they were also advised that the litigation was not cost effective and that one option would be to deal with the funds' claims during the process of reorganizing under chapter 11 of the Bankruptcy Code. The corporations filed their separate chapter 11 cases on November 21, 1989.

In August, 1990, Dean Pierce, on behalf of Terminal and Van Lines, contacted the

business representative of the union to initiate discussions regarding modifications to the collective bargaining agreements. On August 24, 1990, Pierce met with union business representative Theodore M. Colt to discuss the corporations' proposals. A follow-up letter five days later outlined the corporations' proposed revisions to the contracts. The proposed changes were identical for each contract. They eliminated pension contributions in behalf of the bargaining unit employees and gave the union two options as to the health and welfare contributions: either the bargaining unit employees would be covered under a separate Van Lines' medical plan or the companies' contributions to the health and welfare fund would be limited to the cost of providing medical coverage under Van Lines' own plan. Van Lines provides health insurance to its non-union employees through a plan with the Principal Insurance Group. The union rejected the proposals.

Union acceptance of the proposal would have saved Van Lines and Terminal $3,172.00 each per year in pension contributions. Also, according to Pierce, the combined savings for the two companies on health and welfare contributions would have been $1,300.00. Assuming an equal division of that savings between the two companies, each company would have saved $3,822.00 had the proposals been accepted.

The companies were able to settle the litigation begun by Central States. In accordance with the settlement, each corporation would pay $5,000.00 to the Central States funds to resolve the coverage issues raised by the Central States funds. The corporations would continue to pay monthly contributions to the funds so long as obligated by the union contracts. Pierce's testimony as to whether the settlement finally resolved coverage issues was contradictory. On cross-examination by the union attorney, Pierce testified that the corporations' settlement with the union would finally resolve the coverage issues raised in the Central States Illinois litigation. However, on redirect examination, Pierce stated that those coverage issues would be resolved only for the period through Decem-

ber 28, 1985. The union argues that the settlement completely resolved in the companies' favor the coverage issues raised by Central States, and that there would be no further pursuit of the Central States' position that the companies were obligated to make fund contributions on behalf of non-union employees. The only evidence on which to base a finding in this regard was Pierce's testimony and exhibit 8, a letter from the Central States' attorney to the corporations' attorney outlining the provisions of settlement. The Illinois complaint or petition was not introduced into evidence. Paragraph 4 of exhibit 8 indicates that Central States will not release the corporations from any contribution liability under the contracts which might arise after December 28, 1985. It may be that Central States interprets the settlement to mean that they may not pursue the corporations for contributions for non-union employees. However, this is not clearly set out in the only evidence before the court. It may be, therefore, that Central States may make additional claims against the corporations for unpaid contributions for non-union employees.

Van Lines' profit and loss statement for the year ended December 31, 1990 shows a net loss from operations of $9,944.00. Expenses included depreciation of $11,095.00. Expenses also include contributions to the health and welfare fund, but the required contributions to the pension fund were not made in 1990.

Terminal showed a $17,829.00 net loss from operations in 1990. Expenses included health and welfare contributions but no pension contributions. The warehouse losses, in Pierce's view, resulted from loss of major customers. These customers sought more stable storage locations in view of the potential purchase of the warehouse building by the City of Sioux City. Negotiations between the owner and the City have now ceased, and Terminal is trying to rebuild its customer base. The disclosure statement projections for 1991 are based on this rebuilding effort.

As part of the disclosure statements, the corporations have projected income and ex-

penses for calendar years 1991 and 1992. Separate projections have been made on the basis of two potential outcomes of the pending motions to reject. If the union contract is rejected, the pension contribution is eliminated and health and welfare costs are reduced to those required by the employer's health plan, Terminal's projected net income for 1991 would be $209.84. If the contract is not rejected and Terminal is required to continue to make payments to the Central States funds in behalf of the bargaining unit employee, the corporation projects a loss of $1,486.17. If the union contract is rejected, Terminal's net income for 1992 is projected at $304.84. With the union contract in force, the company projects a loss for 1992 of $884.16. The projections, if rejection is not permitted, are at odds with other evidence. Health and welfare costs, as calculated by the court, based on the contract, would be $3,715.00 in 1991, not $1,428.00 as shown in the projection. Health and welfare contributions for 1992 would be $3,848.00, not $1,456.00 as shown on the projection. If the pension contributions are not eliminated, Terminal's contribution to the pension fund for 1991 would be $3,172.00 for 1991, not $744.00 as shown on the projection. For 1992, it would be $3,172.00, not $759.00.

Adjusting the foregoing expenses and assuming the union contract's continued applicability, the court recalculates Terminal's 1991 and 1992 projections:

| | 1991 | 1992 |
|---|---|---|
| TOTAL REVENUES | $47,442.00 | $48,931.00 |
| Operating Expenses: | | |
| Advertising Expense | 460.00 | 469.00 |
| Bad Debts/Credits | −118.00 | −120.00 |
| Cartage Expense | 4,597.00 | 4,689.00 |
| Donations | 170.00 | 173.00 |
| Dues Expense | 340.00 | 347.00 |
| Health/Welfare | 3,715.00 | 3,848.00 |
| Lease Expense | 2,405.00 | 2,453.00 |
| License Expense | 98.00 | 100.00 |
| Lift Truck Expense | 530.00 | 541.00 |
| Office Expense | 256.00 | 261.00 |
| Pension | 3,172.00 | 3,172.00 |
| Postage Expense | 421.00 | 429.00 |
| Professional Fees | 1,892.00 | 1,929.00 |
| Rent Expense | 26,676.00 | 27,209.00 |
| Telephone Expense | 189.00 | 193.00 |
| Utilities Expense | 2,267.00 | 2,312.00 |
| Warehouse Expense | 2,086.00 | 2,128.00 |
| Total | $49,156.00 | $50,133.00 |
| NET INCOME | ($ 1,714.00) | ($ 1,202.00) |
| Less Bank Loan Payments | 4,487.16 | $ 4,487.16 |
| TOTAL INCOME | ($ 6,201.16) | ($ 5,689.16) |

Van Lines estimates that a continuation of the union obligations on insurance and pension will result in losses for 1991 and 1992. In 1991, the company expects to show a loss of $579.28. In 1992, it would show a loss of $485.28. Had the modifications been accepted or if Van Lines can reduce its costs as proposed upon rejection,

it projects net income in 1991 of $2,783.72, and in 1992, of $2,947.72.

Van Lines' projected losses, if the union contract is adhered to, do not comport with other evidence in the case. Health and welfare contributions for 1991 and 1992 at $4,823.00 and $4,924.00 respectively are too high. Based on the court's earlier calculation, health and welfare contributions for 1991 would be $3,715.00, and for 1992, $3,848.00. Pension contributions would be $3,172.00 for each of the two calendar years, not $147.00 and $150.00 as shown on the projections. By revising those two expenses so that they conform with more reliable evidence in the case, the Van Lines' projections for 1991 and 1992, if the union contract is in place, are as follows:

| | 1991 | 1992 |
|---|---|---|
| TOTAL REVENUES | $270,100.00 | $275,200.00 |
| Operating Expenses: | | |
| Advertising Expense | 3,711.00 | 3,786.00 |
| Bad Debts/Credits | −857.00 | −874.00 |
| Cartage Expense | 22,099.00 | 22,541.00 |
| Claims Expense | 479.00 | 488.00 |
| Commission Expense | −5,480.00 | −5,590.00 |
| Dues and Donations | 1,009.00 | 1,029.00 |
| Equipment and Repairs | 403.00 | 411.00 |
| Health/Welfare | 3,715.00 | 3,848.00 |
| Insurance Purchased | 14,370.00 | 14,658.00 |
| Labor Packing Expense | 251.00 | 256.00 |
| Labor–Office | 60,565.00 | 61,776.00 |
| Labor–Regular | 46,749.00 | 47,684.00 |
| Labor–Contract | 32,302.00 | 32,948.00 |
| Lease Expense | 3,788.00 | 3,864.00 |
| Legal/Acctg. Exp. | 3,384.00 | 3,452.00 |
| License Exp./Permits | 2,954.00 | 3,014.00 |
| Medical Insurance | 9,167.00 | 9,351.00 |
| Miscellaneous Exp. | 277.00 | 282.00 |
| Office Expense | 4,368.00 | 4,456.00 |
| Packing Mat Purch. | 13,309.00 | 13,576.00 |
| Payroll Tax Expense | 4,798.00 | 4,894.00 |
| FUTA Tax Expense | 1,540.00 | 1,571.00 |
| SUTA Tax Expense | 24.00 | 24.00 |
| Pension | 3,172.00 | 3,172.00 |
| Postage Expense | 756.00 | 771.00 |
| Rent Expense | 6,642.00 | 6,775.00 |
| Telephone Expense | 9,672.00 | 9,866.00 |
| Travel Expense | 8,334.00 | 8,507.00 |
| Total | $251,501.00 | $256,536.00 |
| NET INCOME | $ 18,599.00 | $ 18,664.00 |
| Less Bank Loan Payments | 21,095.28 | 21,095.28 |
| TOTAL INCOME | ($ 2,496.28) | ($ 2,431.28) |

Wages for the union employees do not exceed industry-wide standards. Pierce testified that the wages are not "too bad" for the Sioux City location. Only the union

employees receive pension contributions from the company. In order to fund the settlement with the union, the corporations would have to borrow. Such a loan would be at least $15,000.00 since in addition to the $10,000.00⁰ settlement, the corporations would have to bring current pension contributions for the two employees. The amount necessary to do this is expected to be at least $5,000.00. The corporation would repay any loan over time through income from operations. Potential lenders are expected to be the debtors' regular lender or Pierce's father.

Pierce believes that a rejection of the union contract and the settlement with Central States are both essential to not only the reorganization under chapter 11, but to the survival of the companies. If rejection is not approved, Pierce believes a conversion to chapter 7 will be likely. Pierce testified that it was the litigation with the union that prompted the filing of the bankruptcy, and that prior to the litigation, the corporations were able to make all ongoing payments to their creditors from their business income. Pierce feels that with the union litigation settled, the companies would again be able to do so. However, he sees the pension contributions and the additional health costs as financial burdens on the two companies.

There is little evidence on efforts by the corporation to reduce other costs. The only testimony on this issue is Pierce's statement that Terminal had tried to trim expenses as much as possible. There is no evidence that the five non-union employees of Van Lines have been asked to take cuts in pay or benefits.

Van Lines has few creditors. Norwest Bank Sioux City, N.A. is a secured creditor whose claim will be paid in full under the plan. Other than Central States, examinations of the debtor's schedules and the claims show the following unsecured claims:

| | |
|---|---|
| Berens & Tate, P.C. | $ 3,225.77 |
| GE Capital Dealer Distributor f/k/a Contel Credit Corp. | 429.59 |
| Container Packaging Corp. | 641.30 |

Dean Pierce is an unsecured creditor with a priority claim in the amount of $2,000.00. There will also be administrative claims.

Terminal also has few creditors. Norwest Bank has a fully secured claim. From examinations of the schedules and the claims, the following unsecured claims are found:

| | |
|---|---|
| Berens & Tate, P.C. | $ 3,225.77 |
| Pierce Van Lines, Inc. | 11,450.05 |
| O'Keefe Elevator Co., Inc. | 2,167.38 |

The reorganization plan of Van Lines provides for payment in full of administrative expenses and priority tax claims. Norwest Bank's secured claim would be paid in full over time. No payment would be made to Dean Pierce. The plan proposes payment to Berens & Tate in the amount of $361.79, but does not state whether this is a payment in full or payment over time. Central States would receive the settlement amount. The plan does not contain a class of general unsecured creditors, although they appear to exist.

Terminal's plan proposes payment in full of administrative and secured claims. Central States would receive the settlement amount. Berens & Tate would receive $361.79. O'Keefe, as a class VII creditor, would receive no distribution. No mention is made of Van Lines' unsecured claim.

Shareholders of the two corporations would receive no distributions under the plan. Presumably they would retain their shares of stock, although the plan does not say.

## II.

## DISCUSSION

 Debtors-in-possession invoke 11 U.S.C. § 1113 [1] in seeking rejection of their collective bargaining agreements with the union. Generally, in order to obtain rejection of an executory contract, the debtor-in-possession must satisfy a "business judg-

---

1. All further statutory references are to Title 11 of the United States Code unless stated other- wise.

ment test," proving that rejection would benefit general unsecured creditors. *In re Cedar Rapids Meats, Inc.,* 121 B.R. 562, 574 (Bankr.N.D. Iowa 1990). The standards for rejecting collective bargaining agreements are more stringent. The court is required to consider the welfare of the unionized employees. Before a collective bargaining agreement may be rejected, the employer must first make a good faith effort to modify its contract with the union. The requirements of this effort are procedural and substantive § 1113(b)(1)(A), (B), and (b)(2).

Before an employer may seek rejection, it must have made a proposal to the union "which provides for those necessary modifications in the employees' benefits and protections that are necessary to permit reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably ..." § 1113(b)(1)(A). A bankruptcy court may not approve an application to reject a contract unless a pre-application proposal meets such requirement. Section 1113(c)(1). Also, before rejection may be permitted, the court must find that "the authorized representative of the employees refused to accept the proposal without good cause ..." section 1113(c)(2) and that "the balance of the equities clearly favors rejection...." section 1113(c)(3). The debtor-in-possession has the ultimate burden of proof on these issues.

The union resists the employers' applications to reject. It argues that the proposal was insufficient under § 1113(b)(1)(A) in that the proposed modifications were not necessary to permit reorganization and did not assure equitable treatment of all affected parties. The union also contends that it was justified in rejecting the proposal and that the balance of the equities do not favor rejection of the union contracts.

Because the court agrees that the pre-application proposal did not meet the requirements of § 1113(b)(1)(A), rejection of the contracts will not be permitted.

As stated, a satisfactory proposal is one "which provides for those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization of the debtor...." This language has led to judicial division over how "necessary" the modifications must be (the degree of necessity) and to what end they must be necessary. The Third Circuit Court of Appeals requires that " 'necessity' be construed strictly to signify only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization." It construes "necessary" and "essential" as synonymous. *Wheeling–Pittsburgh Steel Corp. v. United Steel Workers of America,* 791 F.2d 1074, 1088 (3rd Cir.1986). The Third Circuit also has concluded that the object of the modifications must be the short term goal of preventing the debtor's liquidation. *Id.* at 1089.

The Second Circuit takes a different approach. It interprets the necessity requirement of § 1113 as compelling the debtor-in-possession to prove that "its proposal is made in good faith and that it contains necessary, *but not absolutely minimal,* changes that will enable the debtor to complete the reorganization process successfully." *Truck Drivers Local 807 v. Carey Transportation Inc.,* 816 F.2d 82, 90 (2nd Cir.1987); *In re Royal Imposing Room, Inc.,* 848 F.2d 345, 348 (2nd Cir.1988), *cert. denied* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). Whether the proposed changes would enable the debtor to successfully complete the reorganization process involves, in the Third Circuit's view, an analysis not only of whether the proposal would have allowed the debtor-in-possession to obtain confirmation but also a consideration of the proposal's effects on the debtor's ultimate "financial health." *Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d at 89.

### III.

This court is inclined to construe strictly the necessity requirement of § 1113. Although different constructions

may be given to the word "necessary"[2], it has a general and frequent usage of "absolutely required" or "indispensable." When something is "necessary", it is "needed to bring about a certain effect or result...." *Webster's II New Riverside University Dictionary* 787 (1986 ed. The Riverside Publishing Co.). This court does not attach great significance to the fact that Congress used the term "necessary" in § 1113(b)(1)(A), and the term "essential" in dealing with pre-application modifications under § 1113(e). "Necessary" and "essential" are synonymous. *Roget's II The New Thesaurus* 628 (1980 ed. Houghton–Mifflin Co.). Furthermore, by reading them as synonymous, I do not agree with the proposition that such a reading makes it impossible for an employer to bargain in good faith over the proposed modifications. See *Truck Drivers Local No. 807 v. Carey Transportation, Inc.*, 816 F.2d at 89. The court in that case points out that by reading "necessary" as the equivalent of "essential", a party must make a proposal which constitutes "truly minimal changes" in the labor agreement. Thus there would be no room thereafter for the good faith bargaining required by the section. *Id.* I respectfully disagree. A fair reading of § 1113(b)(1)(A) does not require that the initial proposal by the employer be the one that satisfies the substantive requirements of § (b)(1)(A). Section 1113(b)(1)(A) may be read to mean only that during the course of the employer's negotiations with the union, such an offer must be made. The statute puts the onus on the parties to continue bargaining in order that the union and the employer resolve their dispute without court intervention. Nowhere in the statute does it require that the employer's best offer be made at the outset of the negotiations. The statute requires only that before the court can permit rejection of the bargaining agreement, the employer must prove that it made a proposal which satisfies the statute.

▪ For a proposal to satisfy § 1113(b)(1)(A), it must propose modifications to the existing labor contract without which the debtor cannot obtain confirmation. Such a formulation requires consideration of the feasibility requirements of 11 U.S.C. § 1129(a)(11). The court must also consider whether the employer, although needing some modifications to successfully reorganize, has sought changes to the contract which materially exceed such needs. The result of such overreaching is that rejection will be prohibited.

▪ Regardless of whether this court follows the Second Circuit or Third Circuit in construing "necessary", debtors-in-possession have failed to prove that their proposal contains modifications necessary to permit reorganization. Important to this conclusion is the testimony of Dean Pierce who stated that prior to the litigation instituted by Central States, debtors were able to pay their ongoing expenses. It was also anticipated by Pierce that with the settlement of the Central States litigation, the corporations would again be able to do so in the future. Although a reduction in the benefits to the two union workers might make reorganization more likely in the sense that reduction of any expenses would make the companies healthier, it does not follow that the corporations cannot obtain confirmation of a reorganization plan without such modifications to the union contracts. As stated by the Third Circuit, "[t]he 'necessary' standard cannot be satisfied by a mere showing that it would be desirable for the trustee to reject a prevailing labor contract so that the debtor can lower its costs." *Wheeling–Pittsburgh Steel Corp.*, 791 F.2d at 1088. There should also be a showing that costs not associated with the union contracts have been reduced. There is insufficient evidence in this case so to find. Also there has been no showing that union labor costs represent a disproportionate share of total expenses.

▪ Debtors have failed to prove that its proposals to the union assured "that all creditors, the debtor and all of the affected parties are treated fairly and equitably...." 11 U.S.C. § 1113(b)(1)(A). The

**2.** *In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887, 895 (10th Cir.1990) (Seymour, J., concurring).

companies appear to be placing a dispropor-tionate burden upon the shoulders of the two union employees in order to reorga-nize. There is no evidence that non-union employees have been asked to take any cuts in benefits or wages or have been asked to provide additional services. Van Lines does not provide a pension plan for non-union employees, and health insurance contributions for non-union employees are less than for union employees. But the burdens of failure and liquidation fall on all employees alike. The union employees should not have to bear the entire burden to preserve everyone's jobs. There is no evidence that Dean Pierce as an officer, shareholder or creditor is shouldering a proportional share of the burdens which are normally foisted upon parties-in-inter-est so a debtor can survive. While it ap-pears that Pierce would not be paid any dividend on his unsecured claim, this sacri-fice is a one-time event; there is nothing in either of the plans to indicate that he would not retain in full his equity interest in the reorganized companies. From an examina-tion of the proposals and the plans, this court finds that debtors are attempting to have the bargaining unit employees bear the burden of the reorganizations without a showing that such a placement of the bur-den is equitable.

## CONCLUSIONS OF LAW

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

The court may not approve the debtors' applications for rejection of their collective bargaining agreements because their pre-application proposals to the union did not meet the requirements of 11 U.S.C. § 1113(b)(1)(A).

## ORDER

IT IS ORDERED that the application of Pierce Terminal Warehouse, Inc. to reject its collective bargaining agreement with General Drivers & Helpers Union Local No. 554 of Sioux City is denied.

IT IS ORDERED that the application of Pierce Van Lines, Inc. to reject its collec-tive bargaining agreement with General Drivers & Helpers Union Local No. 554 of Sioux City is denied. Judgment shall enter accordingly.

SO ORDERED.