**In re HORSEHEAD INDUSTRIES, INC., Debtor.**

**Nos. 02–14024(SMB) to 02–14027(SMB).**

United States Bankruptcy Court, S.D. New York.

Nov. 5, 2003.

Angel & Frankel, P.C., Joshua J. Angel, Frederick E. Schmidt, of Counsel, New York City, for Debtors.

Katz, Friedman, Eagle, Eisenstein & Johnson, Stanley Eisenstein, of Counsel, Chicago, IL, Co-counsel to the Paper, Allied–Industrial, Chemical and Energy Workers' Union.

Levy, Ratner & Behrozzi, David Slutsky, of Counsel, New York City, Co-counsel to the Paper, Allied–Industrial, Chemical and Energy Workers' Union.

Cohen, Weiss And Simon LLP, Joseph J. Vitale, Bruce S. Levine, of Counsel, New York City, for United Steelworkers of America, AFL–CIO–CLC.

Marcus & Shapira, LLP, Darlene M. Nowak, of Counsel, Pittsburgh, PA, for Official Committee of Retired Employees.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART THE DEBTORS' MOTIONS TO REJECT THEIR COLLECTIVE BARGAINING AGREEMENTS AND TERMINATE RETIREE BENEFITS

STUART M. BERNSTEIN, Chief Judge.

The Bankruptcy Code allows a debtor in possession to reject its collective bargaining agreements and terminate its obligations to pay retiree benefits. The debtor must, however, first satisfy the procedural and substantive requirements set out in 11 U.S.C. §§ 1113 and 1114. Here, Horsehead · Industries, Inc. d/b/a Zinc Corporation of America, Horsehead

Resource Development Company, Inc., ZCA Mines, Inc. and Stoney Ridge Materials, Inc. (collectively, the "Debtors") seek to reject seven collective bargaining agreements and terminate retiree benefits payable to their union and non-union employees.

The Court conducted an evidentiary hearing on October 3, 2003. Having considered the testimony of the four witnesses and the documentary evidence, I conclude that the motions should be granted in part and denied in part as further set forth below.

## BACKGROUND

### A. The Debtors' Financial Problems

At all relevant times, the Debtors have been engaged in the business of producing zinc and operating zinc manufacturing facilities at several locations. They filed these cases in August 2002, and have lost money in every month following the petition date. (*See* Tr. 15; DXs 18–28, 34.)[1] More recently, between May 1, 2003 and July 31, 2003 they lost, on the average, $3 million per month, (Tr. 19; DXs 26–28), and in August 2003, they lost approximately $3.3 million.[2] (Tr. 20; DX 34.)

The Debtors' financial problems stem from the low price of zinc to which their revenues are directly tied. (Tr. 16–17.) The price is cyclical and fluctuates. During the past ten years, the London Metal Exchange price has been as high as $0.70 per pound, (Tr. 65), but in late 2001 and during much of 2002, fell to a ten-year low of $0.33 per pound. (*Id.*) The zinc price has since risen to $0.37 per pound, but the increase is not enough to stop the Debtors' losses. (*See* Tr. 17–18; DX 30.) In fact, the price of zinc must rise to somewhere between $0.44 and $0.45 per pound in order for the Debtors to break even on a net profit basis. (Tr. 68–69.)

The recent price trend is nevertheless cause for optimism, provided that the Debtors can hold on. The Debtors project a price rise to between $0.40 and $0.41 per pound in the next year, and an increase to $0.45—the approximate break even point—the following year. Moreover, they predict that the price will continue to increase beyond this two year projection. (Tr. 66.)

In the meanwhile, the Debtors have financed their operations during chapter 11 through debtor-in-possession financing provided by their prepetition secured bank lenders (the "Lenders"). (Tr. 20–21.) Under the loan agreement, the Lenders sweep the lockbox receipts each day, and the Debtors issue a daily funding request to meet that day's payments. (Tr. 26–27.) The Lenders have limited the Debtors' cash draw availability, *i.e.*, their credit line, to $1.7 million. (Tr. 21.) The Debtors forecast, however, that they will exceed the $1.7 million limit during October, 2003, (Tr. 22; DX 29), and will need between $2.0 million and $2.5 million in November and December, 2003. (Tr. 34–35.)

The Debtors have not received any assurances from their Lenders that the $1.7 million cap will be increased, (Tr. 33), and if the Debtors run out of cash, they will be forced to liquidate. (Tr. 40.) In that event, they will incur substantial shutdown costs due to environmental regulations. (Tr. 50.) They project that in a liquidation, the Lenders will recover approximately 40% to 50% on their claims,

---

1. "Tr." refers to the transcript of the hearing held on October 3, 2003. "DX" refers to the Debtors' exhibits received into evidence at the hearing.

2. While not part of the record, the recently filed operating statement covering the month of September, 2003, showed an operating loss of over $2.2 million.

(Tr. 49), leaving the unsecured creditors with nothing.

The Debtors have made several efforts to reduce their operating expenses. Prior to seeking the wage and benefit concessions that are at issue here, the Debtors have cut their costs primarily by converting to an all recycled materials feedstock format from a previous format involving recycled materials plus mined ore. (Tr. 37–38.) In addition, they have not paid their bankruptcy professionals since May 2003. (Tr. 37.) The Debtors are, however, currently unable to make any significant additional cuts except through a reduction in wages and benefits, including retiree benefits. (Tr. 38–39.)

These labor-related costs are substantial. The non-retiree benefit reductions sought by the Debtors from the unions would result in annual savings of approximately $6.5 million. (Tr. 48.) In addition, the Debtors' actuarial studies place the present discounted value of their retiree obligations at $34 million, (DXs 31–33), or approximately $2.5 million per year. (Tr. 46–47.) In other words, the Debtors are seeking, through the wage, benefit and retiree concessions, to save approximately $9 million per year.

Even the relief now sought will provide, at most, a short term solution. The Debtors still need cash, (Tr. 53), and their chapter 11 exit strategy involves the sale of their businesses as going concerns, (Tr. 51), and presumably, the confirmation of a liquidating plan. *See* 11 U.S.C. § 1123(b)(4). The sale efforts have failed twice, and the Debtors are currently in negotiations with a third group interested in buying substantially all of their assets. (Tr. 51.)

## B. The Unions

The Debtors employ 1,000 people at six locations. (*See* Tr. 45.) Approximately 75% of the work force is unionized, (Tr. 78), and belong to one of three unions: (1) the United Steel Workers of America ("USWA"); (2) the Paper, Allied–Industrial, Chemical and Energy Workers' Union ("PACE"); and (3) the Security, Police & Fire Professionals of America ("SPFPA"). (Tr. 76–78, 125–126.) Each of the unions operates through a separate local that represents its members as an individual bargaining agent at one of the Debtors' six locations. (Tr. 77.)

The majority of the unionized workers—85%—belong to the USWA, (Tr. 78), and are represented by Local Nos. 8183, 2599–16 and 8586 at the Debtors' Monaca, Pennsylvania, Palmerton, Pennsylvania and Beaumont, Texas plants, respectively.[3] PACE, the next largest union, represents approximately 15% of the unionized workers, (Tr. 133), through Local Nos. 5–401, 6–0210 and 5–990 at the Debtors' Bartlesville, Oklahoma, Calumet, Illinois and Rockwood, Tennessee facilities, respectively.[4] Finally, SPFPA Local No. 502 represents five security guard employees at the Monaca plant.[5] (Tr. 126.)

In late May, 2003, the Debtors initiated the procedure designed to end in the modification of their collective bargaining and retiree obligations. On or about May 29, 2003, they sent identical letters (*see* DX 8) to each of the seven locals. The thrust of the letter was the Debtors' need for wage

---

**3.** The Beaumont, Monaca and Palmerton collective bargaining agreements were received in evidence as DXs 1, 3 and 4, respectively.

**4.** The Bartlesville, Rockwood and Calumet collective bargaining agreements were received in evidence as DXs 2, 5 and 6, respectively.

**5.** The SPFPA collective bargaining agreement was received into evidence as DX 7.

and benefit concessions in order to consummate an impending sale of their assets. According to the Debtors, the proposed sale agreement required the unions to waive the successorship provisions, obligations or claims under their respective collective bargaining agreements, or alternatively, required the Debtors to obtain a court order authorizing the rejection of the collective bargaining agreements. The letter concluded that a sale might close by the middle of July, calling for expeditious negotiations, and the Debtors promised to contact each of the locals in the near future to arrange a meeting.

The Debtors followed up the May 29th letter with a written proposal to each union. According to John Bechdel, the Debtors' Director of Human Resources and the person who spearheaded the negotiations on the Debtors' behalf, the proposals were crafted to reduce the Debtors' wage and benefit obligations to each local by approximately 18% to 20%. (Tr. 99.) Since each collective bargaining agreement was unique, each of the proposals was tailored to the corresponding labor contract. (Tr. 99, 156.)

The proposals nevertheless followed the same format. They contained a bold-faced warning:

> **In our current financial situation, we will not be able to continue operating without significant cost reductions. We clearly understand that changes to reduce costs are never desirable, but in order for our business to survive, we must make them, now.**

In addition, each proposal generally included the following components: (1) a reduction in hourly wages, (2) a 30% employee contribution toward the cost of medical, dental and vision benefits,[6] (3) a four-week limit on vacations, (4) a revised profit sharing plan that reduced or eliminated the Debtors' contribution, (5) the breaking of seniority and the elimination of seniority rights if certain events occurred, and finally, (6) the elimination of (i) retiree medical benefits for both retirees and active employees,[7] (ii) the Debtors' contributions to the 401(k) plan, (iii) the premium for hours worked on Sundays and (iv) certain holidays.

### 1. USWA

#### a. USWA Local No. 8183

USWA Local No. 8183 ("USWA/Monaca") represents the majority of the unionized workers at the plant located in Monaca, Pennsylvania. On or about June 13, 2003, the Debtors provided USWA/Monaca with a proposal that tracked the provisions discussed above.[8] The parties met to discuss the proposal on June 13, 2003, and met again on or about June 17, 2003. (Tr. 92.) The USWA/Monaca made a counter-proposal on June 19, 2003, and the parties continued to meet and exchange proposals.

On or about September 5, 2003, the representatives of Debtors and USWA/Monaca reached a tentative agreement that resolved all of the outstanding issues save one—the *current* retirees' health benefits. As mentioned earlier, the Debtors initially proposed to eliminate all retiree benefits. The union's June 19th counter-proposal suggested that the retirees pay $20.00 toward the medical benefits. John Bechdel testified that despite the counter-proposal, Charles Leonard, a union staff representative, made it very clear that the USWA

---

6. The Debtors presently pay 100% of these expenses.

7. The Debtors did not propose to terminate the retirees' life insurance benefits.

8. The initial proposal and later proposals and counter-proposals were received as part of DX 10.

never had and never would negotiate away retiree benefits.[9] (Tr. 93, 152–53.)

The USWA, for its part, blamed the impasse on the Debtors. Albert Smith, Jr., the president of USWA/Monaca and a participant in the negotiations, testified that the Debtors adhered to the position that the retirees would have to pay for 100% of their medical benefits. (Tr. 226.) Furthermore, the Debtors provided a new proposal on August 8, 2003, that reiterated this position, and told the union that it was non-negotiable. (Tr. 227.) According to Smith, Bechdel subsequently advised the union that the Debtors intended to change their approach, and not treat the retiree benefits as a collective bargaining issue. Instead, they intended to seek relief from the payment of retiree benefits through the court. (Tr. 229, 230–31.) For whatever the reason, the tentative proposal did not deal with the *current* retirees' health care benefits, although it did deal with future retirees.

The tentative agreement was voted down by the rank-and-file membership. (Tr. 96, 173.)

### b. USWA Local No. 2599–16

USWA Local No. 2599–16 ("USWA/Palmerton") represents the unionized workers at the plant in Palmerton, Pennsylvania. On June 18, 2003, the Debtors forwarded a proposal that contained similar wage and benefit concessions.[10] As with Monaca, the Debtors and the USWA/Palmerton met at various

times, exchanged proposals and counter-proposals, and on or about October 1, 2003, reached a tentative agreement. (DX 11A.)

Despite evidence of negotiations, this tentative agreement also addressed the health benefits of the future retirees but ignored the current retirees. The Debtors had originally proposed to eliminate all retiree health benefits. The union's initial, July 3, 2003, counter-proposal retained retiree health benefits for current retirees and employees, but eliminated them for new hires. The Debtors responded on July 11, 2003, with a proposal that the health plan continue, but the retirees pay 100% of the cost.[11] The union came back on July 17, 2003, with a modified proposal. Once again, new hires would not be eligible for retiree health care. In addition, current retirees and employees would be required to pay 25% of the monthly premium.

The USWA/Palmerton rank and file had not voted on the tentative agreement as of the hearing date. However, the Court has been advised that they rejected it on October 15, 2003.

### c. USWA Local No. 8586

USWA Local No. 8586 ("USWA/Beaumont") represents the Debtors' fourteen unionized employees at the Beaumont plant, which has been idle for several months. (Tr. 105.) On or about July 24, 2003, the Debtors faxed the same general proposal (dated July 16, 2003) to the USWA/Beaumont.[12] USWA/Beaumont of-

9. The Debtors also point to a July 18, 2003 letter signed by Leonard stating that any agreement must contain a "preservation of retiree health care at an affordable price." (*See* DX 10.) This letter, however, undercuts the Debtors' position. The union would not be concerned with the affordability of the health care unless the members would have to bear some of it.

10. The Debtors' proposal and the union's counter-proposal were received in evidence as DX 11.

11. The Debtors view this as more favorable than the termination of the retiree health benefit plan, but the difference is not apparent.

12. The proposal sent to the USWA/Beaumont and any related documents were received in evidence as TX 15.

fered to meet with the Debtors, but they declined. (Tr. 148.) Instead, the Debtors opted to devote their efforts to reaching agreements with the Monaca and Palmerton bargaining units, which comprise 83% of all of their unionized workers, before turning their attention to Beaumont. (Tr. 106.)

### 2. PACE

PACE Locals No. 6–0210, 5–990, and 5–401 represent the unionized workers, respectively, at the Debtors' Bartlesville, Oklahoma, Calumet, Illinois and Rockwood, Tennessee plants. On or about June 26, 2003, the Debtors delivered proposals to each of the locals, following the same format as the USWA proposals,[13] and met with the representatives of all three locals in a joint meeting. (Tr. 117–118, 161–164.) PACE refused to negotiate unless Sun Capital ("Sun"), the Debtors' suitor and possible purchaser, participated in the negotiations. (See DX 13)(Letter from Robert Lofton to John W. Bechdel, dated Sept. 19, 2003.) Ernie Anderson, an official of PACE Local No. 5–401, advised Bechdel after the meeting that the PACE locals would not be submitting counter-proposals.[14] (Tr. 113.) Instead, the PACE locals submitted the Debtors' initial proposals to the rank and file for a vote, and in each case, the initial proposal was overwhelmingly rejected. (Tr. 121; see DXs 12–14.)

Despite PACE's failure to submit any counter-proposals, the Debtors sent revised proposals, on or about September 16, 2003, which incorporated some of the concepts that had been negotiated with the USWA/Monaca. (Tr. 113; see DXs 12–14.) On September 17, 2003, the Debtors furnished additional information to the PACE locals to help them evaluate the revised proposals. (DX 13.) This time, the PACE locals did not submit the revised proposals for a membership vote. Instead, Robert Lofton, a PACE official speaking on behalf of all three locals, wrote to Bechdel on September 19, 2003, (see DX 13), requesting mutually convenient negotiating dates.[15] The meeting request followed on the heels of the Debtors' motion for relief under §§ 1113 and 1114.

### 3. SPFPA Local No. 502

The SPFPA Local No. 502 represents the five security guards at the Monaca Plant.[16] On July 16, 2003, the Debtors submitted a proposal to the SPFPA that followed the same format as the proposals to the Steelworkers,[17] and met with representatives of the SPFPA. (Tr. 126.) The SPFPA did not submit a counter-proposal, and stated that it would reach an agreement with the Debtors once an agreement was reached with the USWA at Monaca. (Tr. 127.)

### 4. Non–Union Retirees

The Debtors have employed and still employ employees who are not represented by a union or covered by any collective bargaining agreement. Many of the retirees fall into this category. After the Debtors filed their motion to terminate all

---

**13.** The Bartlesville, Calumet and Rockwood proposals and subsequent proposals were received in evidence, respectively, as DXs 12, 13 and 14.

**14.** PACE challenged Anderson's authority to speak for the other two locals. Whatever his authority, there is no dispute that the PACE locals never submitted counterproposals.

**15.** Lofton followed up his request by a telephone. (Tr. 191.)

**16.** The SPFPA collective bargaining agreement was received in evidence as DX 7.

**17.** The SPFPA proposal was received in evidence as DX 16.

retiree benefits, they asked the Court to appoint a committee to represent their interests. *See* 11 U.S.C. § 1114(d). The Court granted the motion on August 29, 2003, and by order dated September 9, 2003, appointed the committee (the "Salaried Retirees Committee") selected by the United States Trustee. The Salaried Retirees Committee thereafter retained counsel, and the Court approved the retention on the date of the hearing, October 3, 2003.

On August 20, 2003, prior to the appointment of the Salaried Retirees Committee, John Bechdel sent a letter to John Brown, a salaried retiree and eventual member of the Salaried Retirees Committee. (*See* DX 17.) The letter explained the Debtors' financial straits and the need to terminate retiree benefits. It also forwarded relevant financial information, and stated that the Debtors would like to meet with the Salaried Retirees Committee once it is formed.

At the hearing, the Salaried Retirees Committee and Debtors represented that they had entered into an agreement to resolve the motion as to them. They have not provided a copy of their agreement to the Court.

## DISCUSSION

### A. Introduction

■ Sections 1113 and 1114 govern, respectively, the rejection of collective bargaining agreements and the termination of retiree benefits. The statutory requirements under both sections are the same. *Compare* 11 U.S.C. §§ 1113(b) and (c) *with* 11 U.S.C. § 1114(f); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 519–20 (Bankr. S.D.N.Y.1991) ("[C]ompliance with § 1114 is substantively and procedurally the same as compliance with § 1113"). Accordingly,

the discussion relating to the requirements under § 1113 also applies to § 1114.

■ Section 1113 was passed in 1984 in direct response to the Supreme Court's holding in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) that allowed a debtor to reject a collective bargaining agreement by showing "that the collective bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Id.* at 526, 104 S.Ct. 1188. Section 1113 "replace[d] the *Bildisco* standard with one that was more sensitive to the national policy favoring collective bargaining agreements." *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC*, 791 F.2d 1074, 1089 (3d Cir. 1986). The provision ensures that a chapter 11 debtor-employer cannot unilaterally rid itself of its labor obligations, and instead, mandates good faith negotiations with the union before rejection may be approved. *See* 130 Cong. Rec. H7495 (daily ed. June 29, 1984) (statement of Rep. Morrison) (Section 1113 was enacted to "move us in the direction of a negotiation process rather than a litigation process to save companies that are in trouble without permitting any abuse of chapter 11"); 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (statement of Sen. Packwood) ("the language serves to prohibit any bad faith conduct by [a corporation]").

■ Section 1113 identifies a series of procedural and substantive requirements that the debtor-employer must satisfy before rejection will be permitted. *See Century Brass Prods., Inc. v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers (In re Century Brass Prods., Inc.)*, 795 F.2d 265, 273 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986). The procedur-

al requirements are set forth in § 1113(b) which states:

(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

■■■■■ Section 1113(b) focuses on three elements: the content of the proposal, the relevant information, and the ensuing negotiations. At a minimum, the proposal must contain necessary modifications that are fair and equitable. "[T]he necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."

*Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transp. Inc.*, 816 F.2d 82, 90 (2d Cir.1987); *accord Sheet Metal Workers' Int'l Ass'n, Local 9 v. Mile Hi Metal Sys., Inc. (In re Mile Hi Metal Sys., Inc.)*, 899 F.2d 887, 893 (10th Cir.1990); *see New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 350 (2d Cir.1988) ("A debtor's proposal need not be limited to the bare bones relief that will keep it going."), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). In determining "necessity," the proposal must be viewed as a whole, and not by its specific elements. *See Royal Composing Room*, 848 F.2d at 348. The requirement of fair and equitable treatment forces the debtor to spread the hurt. The burden of saving the debtor must be borne through sacrifice to a similar degree by every constituency. *Carey Transp. Inc.*, 816 F.2d at 90; *Century Brass Prods., Inc.*, 795 F.2d at 273.

■■■■■ In addition, the proposal must be based on reliable information. Further, the debtor must provide the union with the relevant information to evaluate the proposal.

■■■■ Finally, the differences must be negotiated in good faith, a requirement that falls on both parties. This requirement is intertwined with the "good cause" requirement discussed immediately below.

■■■■■ If the debtor satisfies the procedural requirements in § 1113(b), it must meet two additional substantive requirements before the court will authorize it to reject the collective bargaining agreement. Section 1113(c) states:

The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that— (1) the trustee has, prior to the hearing, made a proposal that fulfills the require-

ments of subsection (b)(1); (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors rejection of such agreement.

The "good cause" requirement in subparagraph (1) fosters the goals of good faith negotiations and voluntary modifications. It induces the debtor to propose only those modifications necessary to a successful reorganization while protecting the debtor against the union's refusal to accept its proposal without a good reason. *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90 (2d Cir.1992). Where the union rejects a proposal that is necessary, fair and equitable, it must explain the reasons for its opposition. *Mile Hi Metal Sys., Inc.*, 899 F.2d at 892; *Carey Transp. Inc.*, 816 F.2d at 92. On the other hand, if the union makes counter-proposals that meet its needs while preserving the savings required by the debtor, its rejection of the debtor's proposal will be with "good cause." *See Maxwell Newspapers, Inc.*, 981 F.2d at 90; *Royal Composing Room, Inc.*, 848 F.2d at 349.

The second substantive requirement, contained in § 1113(c)(3), involves the balancing of the equities. This codifies the *Bildisco* standard. *Carey Transp. Inc.*, 816 F.2d at 92. Although § 1113 implicates the concerns of the labor laws, the bankruptcy courts "must focus on the ultimate goal of Chapter 11 when considering these equities . . . and how the equities relate to the success of the reorganization." *Bildisco and Bildisco*, 465 U.S. at 527, 104 S.Ct. 1188; *accord Carey Transp. Inc.*, 816 F.2d at 92–93.[18]

Several of the procedural and substantive considerations in § 1113 are not disputed in this proceeding. The parties concede that the Debtors face serious financial difficulties, and must cut costs. In addition, the unions and the Salaried Retirees Committee have not contested the quality or quantity of the financial information relied on by the Debtors or provided to them. Nor have they argued that the Debtors are attempting to force them to shoulder a disproportionate burden.

### 1. USWA

The USWA has instead focused its challenge on three aspects of the Debtors' motions: the necessity of the proposed modifications, the balancing of the equities, and the failure to negotiate with the USWA regarding the retiree benefits. Since the parties separated the current retirees' health benefits from the balance of the wages and benefits under the collective bargaining agreement, I will too.

The USWA contends that the Debtors have failed to prove that the proposed modifications were necessary for three reasons. First, there is no evidence that the Debtors will be forced into liquidation if modifications are not implemented, or that, in light of the prospects for a strike in the event of rejection, that Debtors' position would improve. Second, they

---

**18.** The *Carey Transportation* Court identified at least six permissible equitable considerations: "(1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtor's financial dilemma." *Carey Transp., Inc.*, 816 F.2d at 93.

did not show that they would be forced into liquidation if they agreed to the USWA counter-proposal. Finally, the evidence does not support a finding that the proposed modifications were necessary to attract potential purchasers.[19]

The evidence showed that the Debtors need to cut their labor costs. They are losing about $3 million each month. Zinc prices are rising, but may take two or more years to reach a level at which the Debtors can operate profitably. The Lenders have refused to increase their line of credit, and the Debtors' cash flow is insufficient to meet their current operating expenses. The Debtors have exhausted their other cost-cutting measures, and their continuing obligations under their collective bargaining agreements may hasten their demise.

"In making the decision whether to permit the debtor to reject its bargaining agreement ..., the court must consider whether rejection would increase the likelihood of successful reorganization." *Carey Transp., Inc.*, 816 F.2d at 89. The modification or termination of those obligations will not guarantee a successful reorganiza-

tion, or necessarily make a reorganization likely. It will, however, make reorganization more likely by permitting the Debtors to operate a little longer while waiting out the market, or attracting someone who will invest in their future.

■■■■■ The Debtors are not required to show either that their proposals are necessary to avoid liquidation, or that the union's less stringent counter-proposals are sufficient to avoid liquidation.[20] The union's argument invokes the Third Circuit's holding in *Wheeling–Pittsburgh Steel Corporation* which strictly construed the phrase "necessary modifications," and limited it to the short term goal of avoiding liquidation. *See Wheeling–Pittsburgh Steel Corp.*, 791 F.2d at 1089. In *Carey Transportation*, the Second Circuit expressly rejected the Third Circuit's interpretation, and gave "necessary" a broader construction that focused on the long range goal of reorganization. *See Carey Transp., Inc.*, 816 F.2d at 89.[21] "A debtor's proposal need not be limited to the bare bones relief that will keep it going." *Royal Composing Room*, 848 F.2d at 350.

19. Although there does not appear to be any dispute, I find that the Debtors satisfied the other procedural obligations under § 1113(b), at least with respect to Monaca and Palmerton. They made a proposal based on reliable information, provided USWA with the information needed to evaluate the proposal, engaged in good faith negotiations and reached tentative agreements with the representatives of USWA/Monaca and USWA/Palmerton over modifications. While it is true that the rank and file rejected the tentative agreements, the accords reached by the negotiators are *prima facie* evidence that the parties negotiated in good faith. This does not mean that the parties should stop negotiating, or that the Debtors should ignore the potential consequences—a strike—should they refuse to negotiate further.

20. Although the USWA raises the issue here, the potential for a strike is one of the consid-

erations addressed in balancing the equities under § 1113(c), and will be discussed at that time.

21. The USWA argues that the Third Circuit's view is the better one, and invites me to reject or dilute the weight accorded to *Carey Transportation* in light of the Third Circuit's approach. (*See Memorandum of Law in Support of Objections of United Steelworkers of America, AFL–CIO–CLC to the Debtors' Motions for Authorization to Terminate Retiree Benefits Pursuant to Section 1114 of the Bankruptcy Code and to Reject Collective Bargaining Agreements Pursuant to Section 1113 of the Bankruptcy Code,* dated Oct. 16, 2003, at 12 n. 14.) Given the Second Circuit's express rejection of the Third Circuit's interpretation, the USWA's argument does not merit any consideration.

Further, the Debtors were not required to prove that the modifications are necessary to make them more attractive to a purchaser; the evidence showed that the Debtors needed to cut their labor costs to continue as ongoing concerns, under present ownership or with new investors. *See Maxwell Newspapers, Inc.*, 981 F.2d at 91.

██ The USWA's substantive challenge is directed at the balancing of the equities. It argues that this weighs against rejection because: (1) rejection is likely to lead to a strike; (2) the cost-spreading ability of Debtors' employees is less than that of Debtors' non-employee creditors; (3) rejection may result in substantial employee damage claims; and (4) both the Debtors and the USWA are committed to continued negotiations.

It is undeniable to all that the Debtors must cut their labor costs if they are to have any chance to avoid an immediate shut down and liquidation.[22] If the Debtors are forced to shut down, their 1,000 employees, union and non-union, will lose their jobs, and the Debtors' assets will be sold as scrap rather than as part of an ongoing business. The Debtors' proposals reflect the last means of reducing costs significantly, and call for equal sacrifices from each of the unions.

The USWA has stated that it will strike if the Debtors are allowed to reject their collective bargaining agreements, and force the union to accept the terms its members previously rejected. A strike is an inherent risk in every § 1113 motion, and in the end, it makes little difference if the Debtors are forced out of business because of a union strike or the continuing obligation to pay union benefits to avoid one. The unions may have the legal right

to strike, but that does not mean that they must exercise that right. The union's right to strike carries with it the burden of holding the fate of the rank and file in its hands. Little purpose would be served by a strike if a strike results in the termination of operations and the loss of jobs by the strikers.

The USWA also contends that the non-employee creditors are better able than the union members to absorb the Debtors' cost cutting measures. Although no evidence was offered on this point, I accept it intuitively. Trade and other non-employee creditors can presumably sell their goods and services to other customers. Workers have only their labor to sell, and there may not be any other takers. For the same reasons, however, the employees are least able to absorb the effects of a shut down. Absent rejection, a shut down is likely to occur.

Next, while rejection may result in substantial employee damage claims, rejection will relegate these claims to the status of unsecured debt. 11 U.S.C. § 365(g)(1). Absent rejection, and assuming they have the money, the Debtors will have to pay these claims, as they accrue, on an administrative basis. From the viewpoint of the other creditors, rejection is preferable.

Finally, the parties' commitment to continuing negotiations does not weigh against rejection. The union officials that represented Monaca and Palmerton supported a tentative agreement that the rank and file rejected. This was tantamount to a rejection of the Debtors' proposal without "good cause." *See Carey Transp., Inc.*, 816 F.2d at 92 ("[a] union's presentation of a counter-offer that its members do not support

---

**22.** Here, "liquidation" refers to the sale of the Debtors' assets by a chapter 7 trustee after operations have ceased. The term does not refer to a liquidating plan that may be filed and confirmed after the Debtors have sold their businesses as going concerns, and reduced the property of the estate to cash.

does not satisfy the good cause requirement"). It should be incumbent on the union representatives to submit a counterproposal that enjoys the support of the rank and file and also meets the acknowledged economic needs of the Debtors. The parties should, of course, continue to negotiate, but in the interim, the Debtors must be permitted to reject the Monaca and Palmerton collective bargaining agreements, other than the retiree health benefit provisions, conditioned upon the continuation of negotiations and the payment of wages and benefits in accordance with the parties' tentative agreements. *See Maxwell Newspapers,* 981 F.2d at 85.

■ This conclusion does not apply to Beaumont. Although the parties' posthearing submissions did not distinguish between Monaca and Palmerton on the one hand, and Beaumont on the other, the record relating to Beaumont is sparse. During negotiations, the Debtors devoted their attention to the other two USWA locals, and declined the request to meet with the USWA/Beaumont representatives. This may have made sense since the bulk of the USWA members work at Monaca and Palmerton, but the price of the strategy is that the Debtors have failed to show their compliance with the procedural requirements of § 1113(b). In short, they chose not to negotiate with Beaumont. Accordingly, their motion to reject the Beaumont collective bargaining agreement is denied.

■ Finally, the USWA is correct that the Debtors failed to prove that they engaged in good faith negotiations over their proposal to terminate the benefits payable to current retirees. Bechdel was very credible, but his statement that the union refused to negotiate over retiree benefits is belied by the written record. Both USWA/Monaca and USWA/Palmerton made counter-proposals which called on the current retirees to bear part of the cost of their health benefits. The parties eventually stopped talking about current retiree benefits, viewing each other's position as unreasonable and intransigent. Given the facts, the Debtors have failed to demonstrate that they attempted to "confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits." 11 U.S.C. § 1114(f)(2). Accordingly, their motion under § 1114 to terminate the health benefits payable to the current retirees is denied.

## 2. PACE

■ The negotiations with PACE represented the other end of the spectrum. The Debtors satisfied the procedural requirements of § 1113(b) by making proposals that contained necessary modifications which were fair and equitable to PACE. The proposals were based on reliable information, the Debtors provided PACE with the information needed to analyze the proposals, and offered to meet with PACE to negotiate mutually satisfactory modifications.

In fact, the parties met on June 26, 2003. PACE refused, however, to negotiate unless Sun, the Debtors' suitor was present. PACE also refused to submit counter-proposals, despite the fact that the union representatives knew there was room for negotiation. (Tr. 197.) Instead, PACE took the unusual step of submitting the Debtors' initial proposals to a vote by the rank and file. Given the representatives' lack of support, it is not surprising that the proposals were overwhelmingly rejected. PACE's desire to negotiate was only rekindled after the Debtors made their motions for relief under §§ 1113 and 1114.

PACE nevertheless contends that the Debtors did not bargain in good faith, and PACE rejected their proposal for good cause. The Debtors, PACE argues, made

the initial proposals as a stalking horse for their prospective purchaser, Sun, who did not participate in the negotiations. The record, however, undercuts PACE's position.

Although the Debtors' May 29, 2003, letter tied the need for concessions to a prospective sale, the later proposals, which formed the prelude to the June 26th meeting, did not. They plainly stated that the Debtors "will not be able to continue operating without significant cost reductions." Furthermore, PACE's witness conceded on cross-examination that during the June 26, 2003 meeting, the parties discussed the Debtors' need to reduce costs significantly in order to continue operating. (Tr. 198–99.) The fact that the Debtors' motion again linked the concessions to the possibility of a sale is of no moment because during the brief negotiations, the Debtors made it clear to PACE that they needed the concessions to continue their on-going operations.

Further, the submission of the Debtors' opening offer to a membership vote was unusual, (*see* Tr. 195–96), and inexplicable. Lofton's testimony that the premature vote was intended to get the position of the membership, (*see* Tr. 197), is not credible. When the Debtors submitted another proposal *after* making the rejection motions, PACE pressed for negotiations without putting the new proposal to a vote. Simply put, PACE "stonewalled" the negotiations.

PACE's insistence that Sun participate in the negotiations may have been understandable, but the refusal to negotiate unless Sun participated led to a rejection without good cause. The Debtors, not Sun, were parties to the collective bargaining agreements. They made it clear to PACE that they had to reduce the *Debtors'* costs under the *Debtors'* labor contracts in order for the *Debtors* to survive.

Sun was not even a party to an acquisition agreement approved by the Court. Sun could walk from the deal, as it eventually did, after agreeing with PACE to less stringent concessions that set a ceiling on what the union would be prepared to give up. Consequently, the Debtors' motions to reject the collective bargaining agreements with PACE, and terminate the PACE retiree health benefits is granted, conditioned, once again, upon the continuation of negotiations, and the payment of wages and benefits in accordance with the Debtors' September 16th proposal.

### 3. SPFPA

■ SPFPA rejected the Debtors' offer to submit a counter-proposal until the Debtors reached an agreement with USWA/Monaca. SPFPA also declined to take part in the Bankruptcy Court proceedings. For the reasons stated, the Debtors satisfied their burden of proving compliance with the procedural requirements in §§ 1113 and 1114, and also showed that the balancing of the equities favored the rejection of the collective bargaining agreement and the termination of the retiree health benefits.

The only question is whether SPFPA's unilateral refusal to negotiate, leading to the *de facto* rejection of the Debtors' opening proposal, lacked good cause. SPFPA's strategy may have centered on the fact that its five member local at Monaca did not want to be the tail wagging the USWA/Monaca dog. This, however, is speculation; SPFPA did not participate in the hearing. The Debtors proved that the SPFPA ignored their request to negotiate, and consequently, rejected the Debtors' proposal without good cause. Accordingly, the motions are granted with respect to the SPFPA, subject, however, to the same conditions attending the relief granted against the USWA and PACE.

### 4. Salaried Retirees Committee

The Salaried Retirees Committee participated in the hearing, but presumably as a result of its agreement with the Debtors, did not submit post-trial proposed findings of fact or conclusions of law. Based on what the parties said, I assume that this aspect of the Debtors' § 1114 motion has been settled, and will, therefore, deny it as moot. If I am incorrect, the parties should contact chambers, and I will issue a supplemental ruling on the Debtors' motion.

### CONCLUSION

The Debtors' motions under §§ 1113 and 1114 of the Bankruptcy Code are granted in their entirety as to PACE and the SPFPA, and denied as to the USWA at Beaumont. The motion to reject the collective bargaining agreements is granted with respect to the USWA/Monaca and USWA/Palmerton, but the corresponding motion to terminate the obligation to pay the current retiree health benefits is denied. Finally, the motion to reject the health benefits payable to the salaried retirees is denied as moot. To the extent that the Debtors' rejection and retiree benefit termination motions have been granted, the Debtors may not reduce the wages and benefits below their most recent proposal. Lastly, regardless of whether the motions have been granted or denied, the parties should continue to negotiate with a view toward maintaining the Debtors as going concerns, preserving 1,000 jobs and retiree benefits, and achieving a distribution to the creditors of the estates.