CARDAMONE, Circuit Judge:
This appeal is part of the final acts in a drama — whose denouement is unknown— that will determine whether the Daily News, one of New York City’s four venerable newspapers, survives. Nearly 20 years ago the typesetters’ union, faced with the *87 reality that technological advances necessary for the continued viability of a modern newspaper had made their skilled craft obsolete, consented to automation. In return, the typesetters obtained a guarantee of lifetime employment.
That July 1974 guarantee was provided for in a collective bargaining agreement and assumed by the Daily News, now a debtor in bankruptcy reorganization. It is at the heart of the litigation before us. As a debtor the newspaper is awash in red ink, having lost over $100 million in the past ten years. It has asked the bankruptcy court to modify the labor contract by eliminating the lifetime guarantees given its 167 typesetters. The typographers’ union asks us what such guarantees mean, if they are not honored. All but 15 of these employees, under the debtor’s proposal, will lose their jobs over time. To this question there is no convincing answer except perhaps that nothing is forever today.
The circumstances confronting the debt- or and the printers are like those facing a Navy ship torpedoed at sea. Drastic damage control instituted at the site seals off that portion of the vessel, with a disproportionate loss of those ill-fated to be in that section. These measures are necessary so that the ship and its remaining crew might survive. The present debtor, like the ship, is in danger of foundering, eliminating not only the typesetters’ jobs, but also costing the 1850 other employees their livelihoods as well. Modification of the collective bargaining agreement, like naval damage control, is not something good or pleasing to contemplate, but without it this newspaper will sink.
The New York Typographical Union No. 6 (Local No. 6 or union) and Maxwell Newspapers, Inc., doing business as the Daily News (debtor or Maxwell) cross-appeal from an order of the United States District Court for the Southern District of New York (McKenna, J.), which affirmed in part and reversed in part an order of the Southern District Bankruptcy Court (Brozman, J.). Maxwell is the debtor in a bankruptcy proceeding where a buyer of the newspaper is sought, and Mortimer Zuckerman is the prospective buyer. After filing these appeals on December 10, 1992, the parties moved to consolidate and expedite them so that they could be heard and decided before December 31, 1992 when the issues, if still unresolved, will be rendered moot. On Tuesday, December 15 the motion to consolidate and expedite was granted and the appeals were heard on Thursday, December 17, 1992.
BACKGROUND
A. Overview of Negotiations
This procedurally complex case arises from the effort by the debtor Maxwell to find a buyer for the Daily News with sufficient resources to satisfy not only its creditors and its employees, but also to modernize the Daily News’ printing plant so that it can compete in the New York metropolitan market. In September 1992 Mortimer Zuckerman — through his affiliate New DN Company — entered negotiations with the Daily News to buy its assets. These negotiations included a so-called “stand-alone plan of reorganization” that was conditioned on union support. One crucial component of the plan was concessions by Local No. 6 with respect to the July 28, 1974 collective bargaining agreement that guaranteed the printers lifetime employment.
On October 1,1992 the debtor, in tandem with Zuckerman, proposed to the union that the collective bargaining agreement be modified to eliminate: (1) any obligation of Maxwell to require the purchaser of the assets of the Daily News to employ any member of the union, (2) any obligation of Maxwell to continue to employ any member of the union if Maxwell ceases publication or ceases publication and sells the Daily News pursuant to the bankruptcy proceeding, and (3) any obligation to arbitrate any controversy regarding these matters. Maxwell also provided documentation of the impact of the union’s collective bargaining agreement on the financial stability of the Daily News and asserted that it had sought in vain prospective purchasers who would honor the labor agreement.
The union made a counter-proposal on October 14 in which it expressed a willing *88 ness to forego the lifetime job guarantees. The union proposed a progressive reduction in the number of shifts worked conditioned upon a cash buyout for each union member, three years’ contribution to the pension and welfare funds, and an early retirement enhancement. The parties bargained in terms of shifts rather than jobs. Five shifts per week equals one full-time job; 200 shifts equal 40 full-time jobs. The full-time jobs of the 167 members of Local No. 6 are represented by 835 shifts. The progressive reduction proposed by the union began with an immediate reduction from 835 shifts to 540, then to 425 in 1996, to 300 in 1999, and to 200 in 2002. Translated into jobs that is 108, 85, 60 and finally 40. The initial cut to 540 shifts was designed to induce union members age 62 or older to retire. Although not acceptable to the debtor, Maxwell found this a constructive approach.
The next day, October 15, Maxwell responded with a proposal that hastened the reduction in shifts. The debtor’s proposed modification contemplated an immediate cut to 400, a reduction to 300 once a proposed new color printing plant was operational, and then in one year intervals reductions to 250, to 200, and finally to 150. Translated into jobs that is 80, 60, 50, 40 and finally 30. Maxwell’s proposal did not provide for any cash buyout or payment to the pension and welfare funds, but it offered an early retirement subsidy that would take the form of adding five years to the age at retirement and five years to the working time at the Daily News (referred to as 5 + 5). On October 19, the union made a counter-proposal that stood firm on the first shift reduction remaining at 540 (or 108 jobs) but accelerated the dates and times of all later reductions down to 200 shifts (40 jobs). It agreed tentatively to Maxwell and Zuckerman’s “5 + 5” proposal. It did not address the other changes, awaiting resolution of differences on guaranteed shifts, buyouts, and the publisher’s jurisdiction over work assignments.
Negotiations continued on October 21 when the union revised its October 19 offer by dropping the buyout, increasing the “5 + 5” retirement enhancements to 6 years, that is “6 + 6,” adding a $10,000 cash payment to retiring employees, and lowering the first shift reduction from 540 to 500 (from 108 to 100 jobs) and the second to 350 (70 jobs). The union also demanded a guarantee that remaining employees would receive at least four shifts per week, but then retreated from this demand in the face of Zuckerman’s strong opposition.
Late in the evening of that same day, Zuckerman delivered a final proposal reacting to the union’s revised offer. Zucker-man’s offer reduced the guaranteed shifts immediately to 400 (80 positions), to 300 (60 jobs) when the new printing plant opened, to 150 (30 jobs) one year later, and to 75 (15 jobs) a year after that. These remaining 15 jobs would be guaranteed for the remainder of the 13 year contract. Zucker-man withdrew his “5 + 5” proposal and did not propose any other continued payments to the pension and welfare fund. He did agree to make one immediate contribution of $1 million, which equals 18 months of continuing coverage.
At oral argument before us it was conceded that the total value of the package offered by Zuckerman to Local No. 6 amounts to approximately $30 million, and that Zuckerman has now reinstated its earlier “5 + 5” offer.
B. Prior Judicial Proceedings
These negotiations between the union, the Daily News, and Zuckerman broke down when the union rejected Zuckerman’s final offer to modify the collective bargaining agreement. Zuckerman’s final offer came on the eve of an October 22, 1992 hearing in bankruptcy court to consider the debtor’s motion to reject Local No. 6’s contract and to consider whether the sale to Zuckerman should be approved. The bankruptcy court on October 27, 28 and 29, 1992 issued four orders that are the subject of the cross-appeals before us. It (1) granted Maxwell’s motion pursuant to 11 U.S.C. § 1113 to reject the union’s collective bargaining agreement (rejection order); (2) approved the sale of certain assets that comprise the Daily News as an ongoing business to New DN Company pursuant to 11 *89 U.S.C. § 363 (sale order); (3) denied the union’s motion under 11 U.S.C. § 1104(b) for appointment of an examiner (examiner order); and (4) dismissed as moot the union’s adversary proceeding to compel arbitration (adversary dismissal order).
The union appealed these four orders to the district court, which on December 3, 1992 affirmed the sale order, the examiner order, and the adversary dismissal order. It reversed the bankruptcy court’s rejection order on the ground that under § 1113(c)(2) the union had “good cause” to reject Zuck-erman’s final offer. The district court held therefore that the Daily News had not satisfied those requirements of the Bankruptcy Code necessary to empower a bankruptcy judge to approve rejection of a collective bargaining agreement. The debtor appeals from this order.
DISCUSSION
I. 11 U.S.C. § 1113
We first analyze whether the union in fact had “good cause” to refuse Zucker-man’s final offer. In order to do that we must consider the scope of our review. The district court order is subject to plenary review. See In re Ionosphere Clubs, Inc., 922 F.2d 984, 988 (2d Cir.1990), cert. denied, — U.S. —, 112 S.Ct. 60, 116 L.Ed.2d 28 (1991). We employ the same standard of review over the district court’s holding as it exercised over the bankruptcy court’s. In deciding issues involving 11 U.S.C. § 1113, we review conclusions of law de novo and findings of fact under a clearly erroneous standard. See Truck Drivers Local 807 v. Carey Transp., Inc., 816 F.2d 82, 88 (2d Cir.1987).
Section 1113 of the Bankruptcy Code “controls the rejection of collective bargaining agreements in Chapter 11 proceedings.” In re Century Brass Prods., Inc., 795 F.2d 265, 272 (2d Cir.), cert. denied, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986). The statute put in place “safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion.” Id. Employers may only propose “those necessary modifications in the employees benefits and protections that are necessary to permit” the effective reorganization of the debtor. § 1113(b)(1)(A). A debtor may sell the assets of the business unencumbered by a collective bargaining agreement if that agreement has been rejected pursuant to § 1113. This statute requires unions to face those changed circumstances that occur when a company becomes insolvent, and it requires all affected parties to compromise in the face of financial hardship. At the same time, § 1113 also imposes requirements on the debtor to prevent it from using bankruptcy as a judicial hammer to break the union. Rejection of a collective bargaining agreement is permitted only if the debtor fulfills the requirements of § 1113(b)(1), the union fails to reject the debtor’s proposal with good cause, and the balance of the equities clearly favors rejection. § 1113(c)(l)-(3).
Most importantly, the statute imposes the obligation on the parties to negotiate in good faith. This obligation is properly analyzed under § 1113(c)(2), which permits rejection of a labor agreement only when the union has rejected the debtor’s proposal without good cause. See In re Royal Composing Room, Inc., 848 F.2d 345, 349 (2d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). The district court believed the bankruptcy court’s view of “good cause” under § 1113(c)(2) was too narrow. The bankruptcy court had held that a union would have good cause to refuse an employer’s proposal only in two cases: where its members are “unfairly burdened relative to the other parties,” and where the employer’s “proposal is not necessary for the debtor’s reorganization.” This interpretation, as the district court noted, makes the “good cause ” requirement of § 1113(c)(2) depend entirely upon the satisfaction of the requirements of § 1113(b)(1)(A), which are incorporated into the rejection standard at § 1113(c)(1). This renders “good cause” surplusage because it would add nothing to the existing substantive requirements of § 1113(c)(1) of the statute. See Carey, 816 F.2d at 91-92.
*90 The district court reasoned, in addition, that the statute covers not only the contents of an employer’s proposed modification of a labor contract, but also how the offer is made. It ruled because the offer was made on October 21—on the eve of the bankruptcy hearing—and on a take-it-or-leave-it basis, the union had no meaningful opportunity to consider and make a counter-proposal.
II. Section 1113 Applied
We turn to apply § 1113 to the instant facts. Here, although the bankruptcy court perhaps took a too narrow view of § 1113(c)(2), its findings of fact under that section were not clearly erroneous. Prompted by the bankruptcy judge’s view of the statute, the district court ruled that the bankruptcy court’s findings of fact also were erroneous. In this conclusion, the district court erred.
What “good cause” means is difficult to answer in the abstract apart from the moorings of a given case. A more constructive and perhaps more answerable inquiry is why this term is in the statute. We think good cause serves as an incentive to the debtor trying to have its labor contract modified to propose in good faith only those changes necessary to its successful reorganization, while protecting it from the union’s refusal to accept the changes without a good reason.
To that end, the entire thrust of § 1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process. Reorganization procedures are designed to encourage such a negotiated voluntary modification. See Joseph L. Cosetti & Stanley A. Kirshenbaum, Rejecting Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code—Judicial Precision or Economic Reality?, 26 Duq.L.Rev. 181, 221 (1987). Knowing that it cannot turn down an employer’s proposal without good cause gives the union an incentive to compromise on modifications of the collective bargaining agreement, so as to prevent its complete rejection. Because the employer has the burden of proving its proposals are necessary, the union is protected from an employer whose proposals may be offered in bad faith. See Jeffrey W. Berkman, Note, Nobody Likes Rejection Unless You’re a Debtor in Chapter 11: Rejection of Collective Bargaining Agreements Under 11 U.S.C. § 1113, 34 N.Y.L.Sch.L.Rev. 169, 187-88 (1989).
Thus, for example, a union will not have good cause to reject an employer’s proposal that contains only those modifications essential for the debtor’s reorganization, that is, the union’s refusal to accept it will be held to be without good cause. On the other hand, as we have noted, where the union makes compromise proposals during the negotiating process that meet its needs while preserving the debtor’s savings, its rejection of the debtor’s proposal would be with good cause. See Royal Composing Room, 848 F.2d at 349.
Whether or not the bankruptcy court may have misstated the good cause rule, its findings clearly were not wrong. For example, it found the debtor measures its workforce by calculating “full time equivalents” (FTEs) derived from dividing payroll expenses by five, which is the number of days in a week worked by a full-time employee. The bankruptcy judge further found that from September 1990 to August 1992, FTEs for debtor’s employees declined as follows: for managers 58 percent, guild members 34 percent, drivers 46 percent, pressmen 47 percent, mailers 45 percent, paperhandlers 54 percent, machinists and electricians 21 percent, engravers and ster-eotypers 27 percent. In stark contrast, the Local 6 typographers workforce declined only 13 percent, and these employees are by far the highest hourly paid employees of the debtor. No other employees or unions suffered so small an FTE cut as Local No. 6.
Moreover, unsecured creditors, the court observed, are estimated to obtain only 13 to 18 cents on the dollar and the value of stockholders’ equity is nearly worthless. Yet, the bankruptcy judge declared, the union did not offer an alternative that focused on the needs of its em *91 ployer’s reorganization, but instead adhered to its position that Local 6’s excess employees had to be given an incentive to induce them to leave. Neither the debtor or purchaser could fund this demand. Where there is a plausible view of the evidence, considering the entire record, a factfinder’s determination to adopt that view may not be held clearly erroneous. See Anderson v. City of Bessemer, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
We reverse the district court’s ruling not only on the contents of the rejection order but also concerning the manner in which Zuckerman made his final offer to the union. First, Local No. 6 did not complain that it had too little time to respond to the employer’s proposal made on October 21. In addition, parties to collective bargaining agreements routinely negotiate for many hours under imperative deadlines. In that negotiating universe, ten hours is ample time to consider and respond to a proposal. Consequently, the bankruptcy court correctly concluded that Local No. 6 rejected the employer’s proposal without good cause.
III. Other Issues
Local No. 6 appeals from the three orders of the bankruptcy court affirmed by the district .court, that is, the sale order, examiner order, and adversary dismissal order. The union raises several issues, none of which have merit. It contends that the debtor has not shown that a collective bargaining agreement may be rejected to serve the interests of a purchaser of assets. The two lower courts believed that 11 U.S.C. § 1113 applied to this transaction because what is to emerge, if the sale is consummated, is the Daily News reorganized as an ongoing business. We agree.
The union also contends that the order approving the sale and finding Zuckerman a good faith purchaser was in error. Section 363 of the Bankruptcy Code provides that a debtor-in-possession may, among other actions, “sell” property of the estate, after notice and a hearing. 11 U.S.C. § 363(b)(1) (1988). In the case at hand, the business reasons for the sale were úncontested, only the purchaser’s good faith was put in issue. The bankruptcy court held an in camera hearing on this subject. It authorized the creditors’ committee to conduct a confidential examination to determine whether allegations of improprieties in the form of bonuses or other payments to the pressmen’s and drivers’ unions were well founded. The modest wage increase to the pressmen was effected in the normal process of negotiating a new collective bargaining agreement. There were no payments made or promised to be made outside those contained within the four corners of the final collective bargaining agreement, which the creditors’ committee examined.
The drivers’ union received a first-year bonus based on improvements in returns of newspapers, a matter largely under the drivers’ control. The lack of returns results in significant losses annually to the Daily News. In subsequent years, there will be additional bonuses for each percentage of improvement for returns. After consulting labor counsel the committee concluded this kind of payment is proper under a labor contract. Here, too, there were no payments outside the collective bargaining agreement. The creditors’ committee therefore supported the sale to Zuckerman because it was assured of the integrity of the sale process. After reading the transcript of this investigation, we are satisfied — as was the bankruptcy court — that the purchaser has acted in good faith in pursuing its offer to buy the Daily News.
The other orders the union appealed from were either well within the bankruptcy court’s “broad administrative power”, In re Lionel Corp., 722 F.2d 1063, 1069 (2d Cir.1983); accord, In re Chateaugay Corp., 973 F.2d 141, 144 (2d Cir.1992), were fully supported by findings not clearly erroneous, or are now moot.
CONCLUSION
Having ruled in debtor’s favor, we hasten to add that our judgment is conditioned on the continuation of offers recently nego *92 tiated between the parties, represented to us in open court at the time of the oral argument, which include the offer of 5 + 5. That is, those offers the debtor made to the union that were on the bargaining table as of December 17, 1992 are not now to be withdrawn.
The judgment appealed from is reversed as to the rejection order, conditioned upon terms consistent with this opinion, and otherwise affirmed.