**In the Matter of AMR CORPORATION, Debtors.**

**No. 11–15463(SHL).**

United States Bankruptcy Court, S.D. New York.

Sept. 13, 2012.

Neal D. Mollen, Esq., Jack Gallagher, Esq., Scott M. Flicker, Esq., Paul, Hastings, Janofsky & Walker, LLP, Washington, D.C., Mark D. Pollack, Esq., Paul, Hastings, Janofsky & Walker LLP, Chicago, IL, for Debtors.

Kathy L. Krieger, Esq., Edgar N. James, Esq., Daniel Rosenthal, Esq., David P. Dean, Esq., James & Hoffman, Washington, D.C., for Allied Pilots Association (APA).

John Wm. Butler, Jr., Esq., Skadden Arps Slate Meagher & Flom, LLP, Chicago, IL, for Official Committee of Unsecured Creditors.

Joshua R. Taylor, Esq., Steptoe & Johnson, LLP, Washington, D.C., for APA.

John O'B. Clarke, Jr., Esq., Highsaw, Mahoney & Clarke, P.C., Fairfax, VA, for TWA American Pilots.

BENCH RULING RE: (1) RENEWED MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. 1113 AUTHORIZING DEBTORS TO REJECT COLLECTIVE BARGAINING AGREEMENT WITH THE ALLIED PILOTS ASSOCIATION, AND (2) MOTION IN LIMINE TO LIMIT SCOPE OF HEARING ON THE RENEWED MOTION PURSUANT TO 11 USC 1113 AUTHORIZING DEBTORS TO REJECT COLLECTIVE BARGAINING AGREEMENT

SEAN H. LANE, Bankruptcy Judge.

Before the Court is debtor, American Airlines' renewed motion to reject the col-

lective bargaining agreement of the Allied Pilots Association (the "APA"), under Section 1113 of the Bankruptcy Code. The APA is the authorized collective bargaining agent for pilots employed at American.

American's renewed Section 1113 application as to the pilots is opposed by the APA, the Supplement B Pilot Beneficiaries, and certain TWA/American pilots that make arguments related to Supplement CC (the "Supplement CC Pilots").

Also before the Court is American's related motion *in limine* seeking to limit the evidence that I should consider in this Section 1113 motion. The motion *in limine* is also opposed by the APA and the Supplement CC Pilots.

For reasons that I'll explain in more detail in a moment, the Court grants American's Section 1113 motion and authorizes American to reject its current collective bargaining with the APA.

I agree with the Committee that this present application has to be reviewed in the context of what has previously occurred in this case. While it is not dispositive, it is, nonetheless, informative and shapes what the discussion is today. Thus, central to the Court's ruling today is the history in this case to date regarding Section 1113 matters.

On March 27, 2012, American filed a prior motion under Section 1113 seeking authority to reject its collective bargaining agreement with its pilots, flight attendants and transportation workers. These workers were represented by the APA, the APFA and the TWU, respectively. The Court held a three-week trial on this first Section 1113 motion, starting on April 23, 2012 and ending on May 25, 2012.

During the trial, the three unions and American all engaged in additional negotiations outside the auspices of the Court, including mediation. These negotiations continued after the conclusion of the trial.

No evidence was presented to the Court as to the substance of these negotiations other than the parties expressing their collective desire that the Court refrain from ruling on the Section 1113 application in the—until the parties had a chance to conclude any meaningful negotiations. As a result, the Court abstained from ruling on the Section 1113 application.

In July, all three unions—the APA, the APFA and the TWU—sent out potential agreements to their membership for a ratification vote. None of the substance of these potential new agreements was presented to the Court as part of the Section 1113 proceeding and the potential new agreements constituted the parties efforts at settling their disputes without court intervention. Thus, it seemed obvious to all parties and the Court at the time that such discussions were covered by Federal Rule of Evidence 408, which, generally speaking, prohibits a party from proffering to a Court evidence of settlement discussions.

Indeed, the APA took a strict view as to what was appropriately before the Court for purposes of Section 1113. For example, in the pleading filed at ECF Docket Number 2577 the APA maintained that for purposes of satisfying the requirements under Section 1113(b)(1)(A), the Court could only consider a proposal made by American prior to the filing of the application for rejection.

In any event, the ratification votes of the union members resulted in new collective bargaining agreements between American and the TWU and between American and the APFA, but it did not result in a new agreement between American and the APA.

At that point in August, both American and the APA agreed that it was appropriate for the Court to issue its decision on American's Section 1113 application as to the pilots. Accordingly, the Court issued a

decision on August 15, 2012 ruling on American's Section 1113 application as to the pilots. *See In re AMR Corp.*, 2012 WL 3422541 (Bankr.S.D.N.Y. Aug. 15, 2012).

Generally speaking, the Court concluded that American had established that significant changes were necessary to the APA's collective bargaining agreement for reorganization and the Company had met almost all the requirements of Section 1113. The Court ruled on each element of the statute. These elements included, among other things, the substance of American's proposed modifications and the information provided regarding the proposal. These requirements included the key component of assessing whether the proposed changes were necessary to American's ability to reorganize.

In ruling on this initial Section 1113 application, the Court addressed numerous objections raised by the APA and overruled the APA objections on a host of matters. These included, but were not limited to, the APA's claim that American must first engage in a merger transaction before being granted relief under Section 1113, and that the business plan that American relied upon was fatally flawed and an improper basis for seeking Section 1113 relief.

The Court also rejected the APA's view that the total labor ask of the pilots was not necessary for reorganization and that the Company's costs were converging with industry costs. Additionally, the Court rejected the claim that a number of American's specific proposals relating to the APA were not necessary for reorganization and that the Company's proposal had not been based on the most complete and reliable information available to the Company at that time.

Notably, the Court found that American's business plan provided a sufficient basis for establishing the necessity of the vast majority of the changes sought by the Company. That business plan featured a 20 percent labor cost reduction for each of American's unions, including the APA.

In its decision, however, the Court found that two elements of American's proposal were not consistent with the requirements of Section 1113. More specifically, the Court found that the proposed changes would give American unrestricted use of furlough and codesharing, but such unrestricted and unfettered discretion in those two areas had not been justified as necessary either in American's business plan or by the practices of American's competitors. Given the potential impact of those two proposed changes on the pilots, the Court denied American's motion to reject the pilot contract.

But the Court's August 15th decision specifically stated that such denial was "without prejudice to American seeking relief in the future with a new proposal as to the APA that remedies these deficiencies." *In re AMR Corp.*, 2012 WL 3422541, at *2.

On August 17, 2012, American filed its renewed motion under Section 1113, once again seeking authority to reject its collective bargaining agreement with the APA. In light of the Court's decision, the renewed motion addressed two matters and two matters only, the issues of furlough and codesharing. As to the first, American dropped in its entirety its request to provide the contractual provision regarding furlough. As to the second, American presented a revised codesharing proposal that limits the Company's discretion on codesharing. The revised proposal features a specific proposal with certain partners and has limitations tied to the amount of overall flying done by American. *See* Corrected Decl. of Dennis Newgren in Supp. of Renewed Mot. for Entry of Order Pursuant to 11 U.S.C. § 1113 Authorizing

Debtor to Reject Collective Bargaining Agreement, dated August 17, 2012, ¶¶ 10, 13.

The APA, in fact, notes that the revised codesharing proposal is the same as the codesharing proposal in the proposed agreement sent out to APA members for the vote in July. *See* Revised Decl. of Neil Roghair in Opp'n to Debtors' Renewed Mot. for Entry of Order Pursuant to 11 U.S.C. § 1113 Authorizing Rejection of Collective Bargaining Agreement, dated Sept. 3, 2012, ¶ 23 (the "Roghair Decl.").

With the exception of these changes, American's revised proposal for which it seeks approval is identical to the one proposed by American on April 19, 2012, which was the last proposal made by American prior to the start of the trial on April 23rd. *See* Roghair Decl., ¶ 12. Having addressed the two problematic items that were identified by the Court in its decision on the prior Section 1113 proposal, American now requests that the Court grant its renewed motion to reject.

Section 1113 generally provides that a Court may authorize a debtor to reject a collective bargaining agreement if certain requirements are met. These requirements include that before seeking court relief, the debtor must (1) make a proposal to a union that provides for modifications that are necessary to the debtors' ability to reorganize; (2) that treats creditors, debtors, and affected parties fairly and equitably; and (3) is based on the most complete and reliable information available. *See* 11 U.S.C. § 1113(b)(1)(A).

The statute also requires that the debtor have shared such relevant information with the union as is necessary to evaluate the proposal; (2) that it has conferred in good faith to reach an agreement; (3) that its proposal has been rejected by the authorized representative of the employees without good cause; and (4) that the bal-

ance of equity clearly favors rejection. See 11 U.S.C. § 1113(b)(1)(B), (b)(2), (c).

As the authorized collective bargaining representative to the pilots, the APA filed an objection to American's renewed Section 1113 application. Notably, it does not raise any objection to the revised proposals on furlough and codesharing. This is in stark contrast to the APA's position in the first Section 1113 proceeding where it spent considerable time detailing the alleged deficiencies of American's proposals on both subjects.

But the APA does raise three objections to the renewed motion. First, the APA argues that the Company has revised its target for labor cost savings of all employee groups from 20 percent to 17 percent. They therefore argue that American's continuing request for $370 million in labor cost savings from the pilots, which is based on that 20 percent ask, does not constitute a modification that is necessary to permit reorganization.

The evidentiary basis for this argument, which has been the subject of most of today's proceeding, appears to be communications associated with the settlement negotiations between American and the APA, the APFA and the TWU, which, as noted above, began during the trial and concluded with agreements that were ultimately voted on by each of the unions. The APA also cites to certain statements made regarding the negotiations and their results, as well as information related to the negotiations, including the tentative agreement itself that was reached between the APA and the Company.

Moving on to the second objection, the APA again raises the issue of convergence, in which it argues that American's cost and labor practices for its pilots are in the process of reaching parity with the rest of the industry. It claims that the Company's analysis regarding labor costs for pi-

lots and the industry standards of competing carriers is outdated. The APA cites specifically to a new Delta pilot collective bargaining agreement finalized in July of 2012 and a "agreement in principle" reached at United for which the terms are confidential and not currently known.

The third argument raised by APA is consolidation, namely the notion that American should not be granted Section 1113 relief now because a merger is inevitable. They argue that since the close of the trial, the Company's focus on consolidation has become more concrete and the range of likely partners has narrowed.

■ Two of the APA's objections can be dispatched fairly easily. With respect to convergence with competing carriers, the APA previously made a convergence argument and presented evidence at trial regarding the terms of the Delta collective bargaining agreement. *See, e.g.,* Trial Tr. 111:7–18, May 21, 2012 (Kasper); Trial Tr. 51:11–55:21 May 22, 2012 (Glass).

The Court has already reviewed the evidence submitted by the APA regarding the terms of Delta's new collective bargaining agreement and has overruled the APA's convergence arguments. To the extent that this "new Delta evidence" was not previously put before the Court, it could have been and should have been offered prior to the Court rendering its decision. *See Matthew Bender & Co. v. West Publ'g Co.,* 158 F.3d 674, 679 (2d Cir.1998) (noting that a court's "decision to reopen the proof to allow a party to submit additional evidence is subject to sound discretion.")

As to United, the APA itself admits that the terms of any deal are confidential and, therefore, unknown and instead relies on news articles for the alleged details of this agreement. The danger of relying on such news articles, however, is clear when considering that the most recent articles on this subject describe those negotiations as stalled, with allegations made by the un-

ions of bad faith bargaining on the part of the company.

■ In any event, the allegations and the evidence provided on convergence are subject to the same defect that was identified in the Court's prior decision, namely that it is anecdotal and does not provide an industry-wide comparison with American's costs. And as noted in the prior decision, it is also inconsistent with the fact that American has lost more than $1 billion in 2011 and that the pilots admitted during the prior trial that the status quo was not sustainable.

■ As to the second issue of consolidation, the Court has already acknowledged in its prior decision that there is no merger for the Court to consider. That has not changed today. "While American has begun the process of considering strategic alternatives to its business plan, that process has not yet been completed." *In re AMR Corp.,* 2012 WL 3422541, at *18.

While that process has continued since the issuance of the Court's decision, there is still no fixed outcome for the Court to take into consideration. Thus, as nothing has changed on this subject since the issuance of the Court's opinion on August 15th, the Court rejects the arguments on consolidation for the same reasons set forth in its prior decision.

■ The third argument centers on the 17 percent figure discussed by American and its unions during settlement negotiations. The APA's position here is flawed for several reasons, which are worth discussing in detail.

First and foremost, the APA seeks to set a precedent that would drag the Court into parties' settlement discussions. The parties here tried, but failed to reach a new agreement. The 17 percent cited was the number presented to the APA and American's two other unions as a compro-

mise with the hope of avoiding the Court issuing a ruling on American's rejection motion. The APA now seeks to use those discussions and that figure as a weapon in this litigation.

While the APA says this is not a settlement, that contention is contrary to the vast weight of the evidence. One need only look at the Declaration of Neil Roghair, which is attached to the APA's opposition. In paragraph 4 it lays out Mr. Roghair's testimony, which includes a detailed examination of the differences between American's current proposal that is the subject of this renewed 1113 proceeding, and what's referred to in the Declaration as the tentative agreement with the APA that was the subject of the settlement discussions outside of the Court's purview and was presented to the APA members for a ratification vote.

It then goes through an extensive comparison of the tentative agreement against the current proposal and what American seeks in each. And, in fact, it relies on evidence that does exactly the same. So, for example, in paragraph 20 of the Roghair Declaration, it notes and relies upon a chart that is entitled "APA Term Sheet and Tentative Agreement Comparison, (Roghair Decl., Ex. 2), which does nothing more than compare the APA term sheet that was provided by American for the 1113 proceeding and a tentative agreement which is what was worked out by the parties and then presented to the members for a vote.

And this continues throughout the entire Declaration. Paragraphs 24 and 25 talk about regional jets and codesharing and discuss the terms of the tentative agreement. Paragraph 36 makes the conclusion that the tentative agreement is far more favorable than the August 16th proposal of American. The heading on page 11 of the Declaration says, "By American's own admission, the terms of the tentative agreement would be sufficient to enable the company to reorganize successfully." And I could go on and on.

The Court finds the testimony of Ms. Goulet to be credible in explaining that the genesis of the 17 percent figure was a compromise that American struck with the TWU, the APFA and the APA this summer, which compromises were ratified by union membership except for the APA. The Court is unwilling to fault or punish American for then updating its own business numbers based on the results of such successful settlement negotiations.

It is equally clear, however, that the number that will ultimately be chosen as the labor savings in any business plan will affect the results of these proceedings and the ultimate agreement with the pilots.

Based on all the evidence, then, the Court concludes that the 17 percent figure appears to fall clearly within the ambit of Federal Rule of Evidence 408, which prohibits statements made during settlement negotiations from being introduced as evidence. The Rule is intended to promote "the public policy favoring compromise and settlement of disputes." 1972 Advisory Committee Notes to Fed.R.Evid. 408.

The APA argues that Rule 408 does not apply to Section 1113, but that's belied by the fact that the APA expressly stated to its members that "[t]he terms of the 'last, best final offer,' (LBFO) which represent a significant improvement over the term sheet"—that is American's term sheet for purposes of Section 1113—"will not be taken into consideration by the Court." (Allied Pilots Association, Unknown Unknowns (July 3, 2012), https://public.alliedpilots.org/apa/AboutAPA/APAPublicNews/tabid/843/ctl/ArticleView/mid/1983/articleId/1409/Tentative-agreement-QA.aspx).

The quote continues: "Management's LBFO is technically a section 408 'settlement offer' and separate from the 1113 process." *Id.*

Indeed, the APA explicitly agreed that "[a]ny negotiations between American and APA subsequent to the beginning of the 1113 hearing on April 23rd are confidential and constitute settlement discussions which are not admissible in evidence under Rule 408 of the Federal Rule of Evidence." (Debtors' Motion in Limine, Exh. C).

The applicability of Rule 408 was specifically acknowledged by the Court during trial and was not corrected or qualified by the APA or any other party at that time. (*See* Trial Tr., 91:23–92:4, May 14, 2012(Roghair)). Thus, it is disingenuous at this point to take a contrary position.

The APA also argues that Rule 408 isn't applicable because certain statements were made publicly and the settlement agreements were released to the public. However, these statements relate to negotiations and their results and, therefore, constitute evidence related to negotiations and are covered by the Rule. Indeed, it would be impossible for the unions to vote on whether to accept a settlement offer without releasing it to its members.

The case of *Steede v. Gen. Motors LLC,* 2012 U.S. Dist. LEXIS 81292, *10–*11 (W.D.Tenn. Apr. 3, 2012) is applicable to the situation at hand. In *Steede,* the Court held that the fact that a party had settled on a certain date "likely would be inadmissible because it would be evidence of [in that case] GM offering 'valuable consideration in compromising or attempting to compromise [a] claim'" and it would be offering that evidence to establish liability for damages. *Id.*

For support, that court cited the comments to the 1972 Proposed Rule 408 which stated that "[w]hile the rule is ordinarily phrased in terms of offers to compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto. This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person." *Id.* (*quoting* Fed.R.Evid. 408 (1972 Comments to the Proposed Rule)).

The APA also argues that because negotiations had already concluded, certain of the statements made by the Company are not covered by Rule 408. The APA cites to *S.E.C. v. Pentagon Capital Mgmt. PLC,* 2010 U.S. Dist. LEXIS 25092, *12–*13 (S.D.N.Y. Mar. 11, 2010).

But *SEC v. Pentagon* is clearly distinguishable from the case at hand. In that case, the Court dealt with an order of the SEC that makes findings pursuant to facts discovered in its investigatory authority. The Court held that such findings "are presumed reliable and admissible under Rule 803." *Id.* We have no such situation here.

The APA also relies on a case called *Blu–J, Inc. v. Kemper C.P.A. Group,* 916 F.2d 637, 642 (11th Cir.1990), but it is similarly unhelpful. The case simply reiterates that the Eleventh Circuit test for whether statements fall under the rule is "whether the statements or conduct were intended to be part of the negotiations towards compromise." *Id.* at 642.

*Blu–J* deals with a report made by an accounting firm in connection with negotiations and testimony related thereto, and the Court, in fact, held that the materials fell under the ambit of Rule 408. *See id.* There is simply no discussion of the issue or any facts that would provide support for the APA's position in this case.

The APA further argues that evidence of the Company's business plan is distinguishable from its labor proposals. But the Court believes, based on the totality of

the evidence that I've received, both in declarations and live testimony here today, that such changes are the result of and, therefore, inextricably linked to the settlements with the various unions.

 The Court notes that the use of settlement discussions and the parties' positions on settlement would be particularly damaging in the context of Section 1113. As noted in the Court's August 15th decision, "The language and history of Section 1113 made clear that the preferred outcome under Section 1113 is a negotiated solution rather than contract rejection." *In re AMR Corp.*, 2012 WL 3422541, at *1 (quoting Collier on Bankruptcy ¶ 1113.01 (Alan N. Resnick & Henry J. Somner eds., 16th eds.)). As the Second Circuit has recognized, "the entire thrust of Section 1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process." *New York Typographical Union No. 6 v. Maxwell Newspapers, Inc.*, 981 F.2d 85, 90 (2d Cir.1992).

Thus, the Court concludes that the introduction of such conversations in court proceedings would have a significant chilling effect on the parties' attempts to reach negotiated solutions to the problems of Section 1113. This would add yet another obstacle to what all agree is already an exceedingly difficult process.

The Court further notes that the 17 percent figure relied upon by the APA here was well known before the Court issued its August 15th decision. If those discussions and that figure were truly relevant on the issue of necessity, one would have expected that it would have been brought to the Court's attention prior to issuing the August 15th decision. But they weren't and that's no surprise. It just further confirms that those negotiations were part of efforts to reach a negotiated solution with American's unions.

The APA's reliance on these communications is troubling for several other reasons. By relying on settlements proposed and ultimately reached with American's other unions, the APA now seeks to gain a benefit from being the last holdout from among the three unions. This is inconsistent with Section 1113 jurisprudence. In the Section 1113 proceeding in *Delta Air Lines*, 342 B.R. 685, 694 (Bankr.S.D.N.Y.2006), Judge Hardin rejected the so-called last man standing argument as inappropriate.

 But even assuming the admissibility and truth of these communications, the notion that a three percent difference by itself dooms American's present application is misguided. It is well-established that the necessity test under Section 1113 is not a bare minimum needed for reorganization. "Necessity should not be equated with 'essential' or bare minimum" as noted by the Second Circuit in *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 89 (2d Cir.1987); *see also New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 350 (2d Cir.1988), which notes that "[a] debtor's proposal need not be limited to the bare bones relief that will keep it going."

Simply put, these cases all stand for the proposition that necessity is not a but-for test. *See Delta Air Lines*, 342 B.R. at 694. Indeed, the Second Circuit has specifically rejected the Third Circuit's requirement that necessity "be construed strictly to signify only modifications that the trustee is constrained to accept." *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1088 (3d Cir. 1986).

Such a requirement would make it impossible for the debtor to show it negotiated in good faith since "an employer who initially proposed truly minimal changes would have no room for good faith negoti-

ating, while one who agreed to any substantive changes would be unable to prove that its initial proposals were minimal." *Carey Transp.*, 816 F.2d at 89.

Here, the communications sought to be introduced by the APA mean only that American might be able to succeed with a bare minimum of a 17 percent labor cost reduction, when that 17 percent is coupled with a consensual labor agreement. That would be true because such consensual agreements bring their own benefits to a debtor seeking to reorganize.

As counsel for the Committee noted at today's hearing, consensual agreements constitute labor peace and stability, and Section 1113 does not provide either, even if a debtor prevails during the proceeding. And here, no such consensual agreement exists between American and the APA. Thus the 17 percent figure, without more, does not necessarily invalidate the notion of seeking a 20 percent reduction from the pilots and, in fact, the APA at today's hearing suggested a policy whereby unions would be offered a progressively less beneficial deal depending on where they settled in the order of the ongoing process.

The Court does not adopt that position, but does note that it was something proposed by the very party that's objecting to the 20 percent ask.

The Court notes that rejection is particularly appropriate here where the Court has received extensive evidence of the 20 percent figure, and based on a substantial evidentiary record during the three-week trial found that American has established that figure as necessary for purposes of Section 1113.

Indeed, the Court would be greatly concerned about establishing a bright line numerical necessity rule of the type advocated here by the APA. It would leave little to no negotiating room for the parties to conduct meaningful discussions outside the Court's presence, once again, defeating the congressional purpose behind the statute.

On a side note, it may be true that there has been some recent positive developments on revenue and/or overall business performance in this case. But this is merely a snapshot looking at nothing more than a two or three-month period at most since the end of the last hearing. It says little about what is needed for reorganization, which is a much more long-term inquiry into viability.

As for Ms. Clark's testimony on this question, the Court finds that the communications referenced from the August 16, 2012 meeting do not change the result here. These comments occurred only one week after the pilots had actually rejected the tentative agreement and only one day after the Court's decision on August 15th. The Court further notes that these communications did nothing more than refer, again, to the settlements that had been worked out between American and the unions and that they must be understood in the overall context of the business plan as provided by Ms. Goulet in her testimony here today.

For all these reasons and considering this as a new Section 1113 application within the context of the Court's prior ruling, the Court finds that American's current proposal contains modifications that are necessary to permit American's reorganization and that it satisfies the requirements of Section 1113. And for the reasons stated above, the Court overrules the APA's substantive objections to American's renewed Section 1113 motion.

But even putting aside the fatal substantive flaws in the APA's objection, the Court disagrees with the premise that as a procedural matter, a debtor is prohibited from presenting a new Section 1113 proposal that addresses only defects in its prior proposal without going back to read-

dress all the aspects of its proposal that a Court has already found to pass muster under the statute.

Where a debtor has made a Section 1113 proposal that has been found lacking in some way, the Court must consider the facts and circumstances of each case to determine what is an appropriate way to proceed. The Court notes that other courts have exercised their discretion in such a fashion in appropriate circumstances to allow a debtor to seek relief by remedying specific defects in a prior Section 1113 proposal.

In *Mesaba Aviation, Inc.*, Transcript of Proceedings, Case No. 05–39258 (Bankr. D.Minn. Oct. 5, 2006), for example, the debtor sought to remedy defects in its Section 1113 proposal that had been identified by the District Court on appeal. On remand, the debtor updated its proposal on two discreet issues, but the union sought to reopen the door to a broader necessity inquiry because the revised proposal reduced the savings sought from labor.

The Bankruptcy Court stated that "the present law of the case binds not only me but all the parties to determinations that now are twice settled by my [earlier] decision and [the district court's] affirmance", *id.* at 57:20–23, and this is true notwithstanding the passage of time from the Court's original decision. Here, very little time has passed since the Court's August 15th decision—only 20 days.

Most recently, in *In re Hostess Brands, Inc.*, Transcript of Proceedings, Case No. 12–22052 (Bankr.S.D.N.Y. May 14, 2012), Judge Drain identified specific issues in the debtors' Section 1113 proposal that needed to be fixed and indicated that the Court "would ... be receptive to a motion that makes a proposal along the lines ... outlined," and told the parties that he was "perfectly prepared on short notice to con-

sider an amended proposal." *Id.* at 130:25–131:2, 133:3–4.

Such an approach recognizes that a Court's prior decision remains the law of the case. Here, that decision held that American's business plan established, with the two exceptions noted above, the need for the changes sought by the Company. And this included a finding that the monetary goals sought by the Company were necessary, even though they took a very difficult toll on American's employees, a sad fact that is common to Section 1113 proceedings in bankruptcy. Those findings were based on an extensive factual record, particularly on the issue of necessity over the course of the three-week trial.

Indeed, such a proposal and procedure would be immensely appropriate here given that the only new evidence presented by the union is a single number, namely a percentage discussed between the parties after the Section 1113 trial, but before the Court issued its August 15th decision.

I am not using that procedure for purposes of making my decision, but I will also say that I don't think it would be inappropriate to use that procedure in this particular case.

And, again, I would note that the use of such a procedure would not be appropriate in all circumstances. For example, if there was a major catastrophic event that affected all of the airline industry, then, clearly, there would be a significant change in factual circumstances that would need to be addressed by the parties and the Court.

Finally, the Court notes that two other objections have been filed to the request for Section 1113 relief: One, by the Supplement CC Pilots and the second by the Supplement B Pilot Beneficiaries. They both claim to represent a minority of American pilots who claim separate contractual rights by virtue of Supplement B

and Supplement CC to the collective bargaining agreement that exists between American and the APA.

During the course of the original Section 1113 proceedings, representatives of Supplement B and Supplement CC Pilot Beneficiaries objected to American's application. The Court overruled these objections for the reasons stated in the August 15th decision. There have been no new facts on this issue presented today to the Court and nothing that changes the Court's decision in that ruling.

As to the motion *in limine,* that motion is granted in part and denied in part consistent with the Court's ruling today that precludes evidence of the parties' settlement positions under Federal Rule of Evidence 408.

Let me just say one last thing. Just because this is a renewed motion doesn't mean that it's any less difficult for purposes of employees. I have a lot of sympathy for the employees, the pilots, just as I did when we had our original trial. It's a set of circumstances that nobody is happy about. And I wish you all good luck in trying to work out an agreement and hope that the good faith that was evident in earlier discussions carries over to any discussions moving forward.

And so I hope that all the parties can move beyond my ruling today to do what they're going to have to do, whether I rule for American, for the pilots, for anyone, which is come up with an agreement and that is something that's got to happen. And in some ways I'm the most important person here, because I have to issue a ruling, and in some ways I'm the least important person here because I have no ability to actually work out an agreement between American Airlines and the APA,

and that's something that you all have to do and I have no power to do it for you.